# United States Court of Appeals
## For the First Circuit

No. 12-2312

SUN CAPITAL PARTNERS III, LP; SUN CAPITAL PARTNERS III QP, LP; SUN CAPITAL PARTNERS IV, LP,

Plaintiffs, Appellees,

v.

NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND,

Defendant, Third Party Plaintiff, Appellant,

SCOTT BRASS HOLDING CORP.; SUN SCOTT BRASS, LLC,

Third Party Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Renee J. Bushey and Catherine M. Campbell, with whom Melissa A. Brennan and Feinberg, Campbell & Zack, PC were on brief, for appellant.
Eric Field, Assistant Chief Counsel, with whom Judith R. Starr, General Counsel, Israel Goldowitz, Chief Counsel, Karen L. Morris, Deputy Chief Counsel, Craig T. Fessenden, Attorney, and Beth A. Bangert, Attorney, were on brief, for Pension Benefit Guaranty Corporation, amicus curiae.
Patrick F. Philbin, with whom Theodore J. Folkman, P.C., Murphy & King P.C., John F. Hartmann, P.C., Marla Tun, Jeffrey S. Quinn, Kellen S. Dwyer, John S. Moran, and Kirkland & Ellis LLP were on brief, for appellees.

July 24, 2013

**LYNCH, Chief Judge**.  This case presents important issues of first impression as to withdrawal liability for the pro rata share of unfunded vested benefits to a multiemployer pension fund of a bankrupt company, here, Scott Brass, Inc. (SBI).  See Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq., as amended by the Multiemployer Pension Plan Amendment Act of 1980 (MPPAA), 29 U.S.C. § 1381 et seq.  This litigation considers the imposition of liability as to three groups: two private equity funds, which assert that they are mere passive investors that had indirectly controlled and tried to turn around SBI, a struggling portfolio company; the New England Teamsters and Trucking Industry Pension Fund (TPF), to which the bankrupt company had withdrawal pension obligations and which seeks to impose those obligations on the equity funds; and, ultimately, if the TPF becomes insolvent, the federal Pension Benefit Guaranty Corporation (PBGC), which insures multiemployer pension plans such as the one involved here.  If the TPF becomes insolvent, then the benefits to the SBI workers are reduced to a PBGC guaranteed level.  See 29 U.S.C. §§ 1322a, 1426, 1431.  According to the PBGC's brief, at present, that level is about $12,870 for employees with 30 years of service.

The plaintiffs are the two private equity funds, which sought a declaratory judgment against the TPF.  The TPF, which

brought into the suit other entities related to the equity funds,[1] has counterclaimed and sought payment of the withdrawal liability at issue.  The TPF is supported on appeal by the PBGC, as amicus.[2]

We conclude that at least one of the private equity funds which operated SBI, through layers of fund-related entities, was not merely a "passive" investor, but sufficiently operated,

---

[1] Those related entities are not before us in this appeal.  An entry of default was entered against those parties in the district court, but judgment was never entered on the claims against those parties.  However, it is apparent from the procedural history and actions of the TPF that the TPF has abandoned the claims against those parties, and therefore, we have appellate jurisdiction under 28 U.S.C. § 1291.  See, e.g., Balt. Orioles, Inc. v. Major League Baseball Players Ass'n, 805 F.2d 663, 667 (7th Cir. 1986) ("[A]n order that effectively ends the litigation on the merits is an appealable final judgment even if the district court did not formally enter judgment on a claim that one party has abandoned.").

[2] The authority of the PBGC to promulgate regulations for § 1301(b)(1) is set forth in the statute.  The PBGC is a wholly owned United States government corporation, which is modeled after the FDIC and administers and enforces Title IV of ERISA.  Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 637 (1990).  The PBGC also acts as an insurer of multiemployer plans when a covered plan terminates with insufficient assets to satisfy its pension obligations (i.e., is insolvent).  Id. at 637-38.  When a multiemployer plan becomes insolvent, benefits must be reduced to the PBGC-guaranteed level, and the PBGC provides the plan with financial assistance.  See 29 U.S.C. §§ 1322a, 1426, 1431.  In this case, it is not clear whether the plan will become insolvent if the private equity funds are not determined to have withdrawal liability, and as a result, it is not clear whether the PBGC will incur any losses.
The PBGC insures about 1450 multiemployer plans covering about 10.3 million participants.  Pension Benefit Guaranty Corporation, 2012 PBGC Annual Report 33, available at http://www.pgbc.gov/documents/2012-annual-report.pdf. It provides about $95 million in annual financial assistance to 49 insolvent multiemployer plans covering 51,000 participants.  Id.  As of the end of fiscal year 2012, the PBGC's multiemployer insurance fund had a negative net position of $5.237 billion.  Id.

managed, and was advantaged by its relationship with its portfolio company, the now bankrupt SBI. We also conclude that further factual development is necessary as to the other equity fund. We decide that the district court erred in ending the potential claims against the equity funds by entering summary judgment for them under the "trades or businesses" aspect of the two-part "control group" test under 29 U.S.C. § 1301(b)(1). See Sun Capital Partners III, LP v. New Eng. Teamsters & Trucking Indus. Pension Fund, 903 F. Supp. 2d 107, 116-18, 124 (D. Mass. 2012).

As a result, we remand for further factual development and for further proceedings under the second part of the "control group" test, that of "common control," in 29 U.S.C. § 1301(b)(1). The district court was, however, correct to enter summary judgment in favor of the private equity funds on the TPF's claim of liability on the ground that the funds had engaged in a transaction to evade or avoid withdrawal liability. See 29 U.S.C. § 1392(c); Sun Capital, 903 F. Supp. 2d at 123-24.

I.

The material facts are undisputed.

A.      The Sun Funds

Sun Capital Advisors, Inc. ("SCAI") is a private equity firm founded by its co-CEOs and sole shareholders, Marc Leder and Rodger Krouse. Sun Capital, 903 F. Supp. 2d at 109. It is not a plaintiff or party in this case. SCAI and its affiliated entities

find investors and create limited partnerships in which investor money is pooled, as in the private equity funds here. Moreover, SCAI finds and recommends investment opportunities for the equity funds, and negotiates, structures, and finalizes investment deals. Id. SCAI also provides management services to portfolio companies, and employs about 123 professionals to provide these services.

The plaintiffs here are two of SCAI's private equity funds (collectively the "Sun Funds"), Sun Capital Partners III, LP ("Sun Fund III")[3] and Sun Capital Partners IV, LP ("Sun Fund IV"). They are organized as Delaware limited partnerships. SBI is one of their portfolio companies, and the two Sun Funds have other portfolio companies. The Sun Funds do not have any offices or employees; nor do they make or sell goods, or report income other than investment income on their tax returns.[4] Id. at 117. The

---

[3] Sun Fund III is technically two different funds, Sun Capital Partners III, LP and Sun Capital Partners III QP, LP. Like the district court, we consider them one fund for purposes of this opinion because they are "parallel funds" run by a single general partner and generally make the same investments in the same proportions. Sun Capital Partners III, LP v. New Eng. Teamsters & Trucking Indus. Pension Fund, 903 F. Supp. 2d 107, 109 n.1 (D. Mass. 2012).

[4] For ERISA purposes, the Sun Funds are Venture Capital Operating Companies (VCOC). According to the Sun Funds' private placement memos to potential investors, this requires that the partnerships:
(i) . . . ha[ve] direct contractual rights to substantially participate in or substantially influence the management of operating companies comprising at least 50% of its portfolio (measured at cost) and (ii) in the ordinary course of [their businesses], actively exercis[e] such management rights with respect to at

stated purpose of the Sun Funds is to invest in underperforming but market-leading companies at below intrinsic value, with the aim of turning them around and selling them for a profit.  As a result, the Sun Funds' controlling stakes in portfolio companies are used to implement restructuring and operational plans, build management teams, become intimately involved in company operations, and otherwise cause growth in the portfolio companies in which the Sun Funds invest.  The intention of the Sun Funds is to then sell the hopefully successful portfolio company within two to five years. In fact, the Sun Funds have earned significant profits from sales of various portfolio companies.[5]

These private equity funds engaged in a particular type of investment approach, to be distinguished from mere stock holding or mutual fund investments.  See, e.g., S. Rosenthal, Taxing Private Equity Funds as Corporate 'Developers', Tax Notes, Jan. 21, 2013, at 361, 364 & n.31 (explaining that private equity funds differ from mutual funds and hedge funds because they "assist and manage the business of the companies they invest in").  As one

_____

least one of the operating companies in which [they invest]. An "operating company" is an entity engaged in the production or sale of a product or service, as distinguished from a reinvesting entity.
See also 29 C.F.R. § 2510.3-101(d)(1), (d)(3).  We do not adopt the TPF's argument that any investment fund classified as a VCOC is necessarily a "trade or business."

[5] For instance, Sun Fund IV, the larger of the Funds, reported total investment income of $17,353,533 in 2007, $57,072,025 in 2008, and $70,010,235 in 2009.

commentator puts it, "[i]t is one thing to manage one's investments in businesses.  It is another to manage the businesses in which one invests."  C. Sanchirico, <u>The Tax Advantage to Paying Private Equity Fund Managers with Profit Shares: What Is It?  Why Is It Bad?</u>, 75 U. Chi. L. Rev. 1071, 1102 (2008).

The Sun Funds are overseen by general partners, Sun Capital Advisors III, LP and Sun Capital Advisors IV, LP.  Leder and Krouse are each limited partners in the Sun Funds' general partners and, together with their spouses, are entitled to 64.74% of the aggregate profits of Sun Capital Advisors III, LP and 61.04% of such profits from Sun Capital Advisors IV, LP.  The Sun Funds' limited partnership agreements vest their respective general partners with exclusive authority to manage the partnership.  Part of this authority is the power to carry out all the objectives and purposes of the partnerships, which include investing in securities, managing and supervising any investments, and any other incidental activities the general partner deems necessary or advisable.

For these services, each general partner receives an annual fee of two percent of the total commitments (meaning the aggregate cash committed as capital to the partnership[6]) to the Sun Funds, paid by the limited partnership, and a percentage of the Sun

---

[6] The aggregate capital commitment of Sun Fund IV was $1.5 billion, which the TPF asserts means the management fee at the 2% rate was $30 million.

Funds' profits from investments. The general partners also have a limited partnership agreement, which provides that for each general partner a limited partner committee makes all material partnership decisions. Sun Capital, 903 F. Supp. 2d at 110-11. Leder and Krouse are the sole members of the limited partner committees. Id. at 111. Included in the powers of the limited partner committees is the authority to make decisions and determinations relating to "hiring, terminating and establishing the compensation of employees and agents of the [Sun] Fund or Portfolio Companies." The general partners also each have a subsidiary management company, Sun Capital Partners Management III, LLC and Sun Capital Partners Management IV, LLC, respectively. Id. These management companies contract with the holding company that owns the acquired company to provide management services for a fee, and contract with SCAI to provide the employees and consultants. See id. When portfolio companies pay fees to the management companies, the Sun Funds receive an offset to the fees owed to the general partner.[7]

B.      The Acquisition of Scott Brass, Inc.

---

[7] This sort of fee arrangement is common in private equity funds. See S. Rosenthal, Taxing Private Equity Funds as Corporate 'Developers', Tax Notes, Jan. 21, 2013, at 361, 362 n.6 (explaining that equity funds usually pay the fees to their general partners, which often redirect the fee to a management services company that renders the management services for the partnership, and that the general partner or management company will often receive fees from the portfolio company, in which case the partnership (the equity fund) receives a fee offset).

In 2006, the Sun Funds began to take steps to invest in SBI, the acquisition of which was completed in early 2007. Leder and Krouse made the decision to invest in SBI in their capacity as members of the limited partner committees.

SBI, a Rhode Island corporation, was an ongoing trade or business, and was closely held; its stock was not publicly traded. SBI was a leading producer of high quality brass, copper, and other metals "used in a variety of end markets, including electronics, automotive, hardware, fasteners, jewelry, and consumer products." In 2006, it shipped 40.2 million pounds of metal. SBI made contributions to the TPF on behalf of its employees pursuant to a collective bargaining agreement.

On November 28, 2006, a Sun Capital affiliated entity sent a letter of intent to SBI's outside financial advisor to purchase 100% of SBI. In December 2006, the Sun Funds formed Sun Scott Brass, LLC (SSB-LLC) as a vehicle to invest in SBI. Sun Fund III made a 30% investment ($900,000) and Sun Fund IV a 70% investment ($2.1 million) for a total equity investment of $3 million. This purchase price reflected a 25% discount because of SBI's known unfunded pension liability.[8] SSB-LLC, on December 15, 2006, formed a wholly-owned subsidiary, Scott Brass Holding Corp.

---

[8] The Sun Funds contend that they reduced the purchase price based on the expectation that a future buyer would pay less for a company with unfunded pension obligations, not because of a concern that they were incurring potential withdrawal liability.

(SBHC). SSB-LLC transferred the $3 million the Sun Funds invested in it to SBHC as $1 million in equity and $2 million in debt. Id. at 111. SBHC then purchased all of SBI's stock with the $3 million of cash on hand and $4.8 million in additional borrowed money. Id. The stock purchase agreement to acquire SBI's stock was entered into on February 8, 2007.[9]

On February 9, 2007, SBHC signed an agreement with the subsidiary of the general partner of Sun Fund IV to provide management services to SBHC and its subsidiaries, i.e., SBI. Since 2001, that general partner's subsidiary had contracted with SCAI to provide it with advisory services. In essence, as the district court described, the management company acted as a middle-man, providing SBI with employees and consultants from SCAI. Id.

Numerous individuals with affiliations to various Sun Capital entities, including Krouse and Leder, exerted substantial operational and managerial control over SBI, which at the time of the acquisition had 208 employees and continued as a trade or business manufacturing metal products. For instance, minutes of a March 5, 2007 meeting show that seven individuals from "SCP" attended a "Jumpstart Meeting" at which the hiring of three SBI salesmen was approved, as was the hiring of a consultant to analyze

_____

[9] The cover page of the agreement states the agreement is dated February 8, 2007, but the text of the stock purchase agreement says it is dated February 9, 2007. The discrepancy is not of importance here.

a computer system upgrade project at a cost of $25,000. Other items discussed included possible acquisitions, capital expenditures, and the management of SBI's working capital. Further, Leder, Krouse, and Steven Liff, an SCAI employee, were involved in email chains discussing liquidity, possible mergers, dividend payouts, and concerns about how to drive revenue growth at SBI. Leder, Krouse, and other employees of SCAI received weekly flash reports from SBI that contained detailed information about SBI's revenue, key financial data, market activity, sales opportunities, meeting notes, and action items. According to the Sun Funds, SBI continued to meet its pension obligations to the TPF for more than a year and a half after the acquisition.

C.        SBI's Bankruptcy and This Litigation

In the fall of 2008, declining copper prices reduced the value of SBI's inventory, resulting in a breach of its loan covenants. Unable to get its lender to waive the violation of the covenants, SBI lost its ability to access credit and was unable to pay its bills. See id.

In October 2008, SBI stopped making contributions to the TPF, and, in so doing, became liable for its proportionate share of the TPF's unfunded vested benefits. See 29 U.S.C. §§ 1381(a), 1383(a)(2). In November 2008, an involuntary Chapter 11 bankruptcy proceeding was brought against SBI. The Sun Funds assert that they

lost the entire value of their investment in SBI as a result of the bankruptcy.

On December 19, 2008, the TPF sent a demand for payment of estimated withdrawal liability to SBI. The TPF also sent a notice and demand to the Sun Funds demanding payment from them of SBI's withdrawal liability, ultimately calculated as $4,516,539. Sun Capital, 903 F. Supp. 2d at 111. The TPF asserted that the Sun Funds had entered into a partnership or joint venture in common control with SBI and were therefore jointly and severally liable for SBI's withdrawal liability under 29 U.S.C. § 1301(b)(1). Id.

On June 4, 2010, the Sun Funds filed a declaratory judgment action in federal district court in Massachusetts. The Sun Funds sought a declaration that they were not subject to withdrawal liability under § 1301(b)(1) because: (1) the Sun Funds were not part of a joint venture or partnership and therefore did not meet the common control requirement; and (2) neither of the Funds was a "trade or business."

The TPF counterclaimed that the Sun Funds were jointly and severally liable for SBI's withdrawal liability in the amount of $4,516,539, and also that the Sun Funds had engaged in a transaction to evade or avoid liability under 29 U.S.C. § 1392(c). The parties both filed cross-motions for summary judgment in September 2011.

The district court issued a Memorandum and Order on October 18, 2012, granting summary judgment to the Sun Funds.  Id. at 109.  The district court did not reach the issue of common control, id. at 118, instead basing its decision on the "trade or business" portion of the two-part statutory test.  It also decided the "evade or avoid" liability issue.[10]

On the "trade or business" issue, the district court addressed the level of deference owed to a September 2007 PBGC appeals letter that found a private equity fund to be a "trade or business" in the single employer pension plan context.  Id. at 114-16.  The appeals letter found the equity fund to be a "trade or business" because its controlling stake in the bankrupt company put it in a position to exercise control over that company through its general partner, which was compensated for its efforts.

The district court held that the appeals letter was owed deference only to the extent it could persuade.  Id. at 115.  The district court found the letter unpersuasive for two reasons: (1) the appeals board purportedly incorrectly attributed activity of the general partner to the investment fund; and (2) the appeals board letter supposedly conflicted with governing Supreme Court tax precedent.  Id. at 115-16.  Engaging in its own analysis, the court found that the Sun Funds were not "trades or businesses," relying

_____

[10] No party demanded a jury trial in the event the district court found that the case should proceed to trial rather than be resolved at summary judgment.

-14-

on the fact that the Sun Funds did not have any offices or employees, and did not make or sell goods or report income other than investment income on their tax returns. Id. at 117. Moreover, the Sun Funds were not engaged in the general partner's management activities. Id.

As to its "evade or avoid" liability analysis, the district court stated that § 1392(c) was not meant to apply to an outside investor structuring a transaction to avoid assuming a potential liability. Id. at 122. The language of the statute suggested that "it is aimed at sellers, not investors," id., and imposing liability on investors for trying to avoid assumption of such liability would disincentivize investing in companies subject to multiemployer pension plan obligations, thereby undermining the aim of the MPPAA, id. at 124.

The TPF has timely appealed. It argues that the district court erred in finding that the Sun Funds were not "trades or businesses" and that the Sun Funds should be subject to "evade or avoid" liability under § 1392(c). The PBGC has filed an amicus brief on appeal in support of reversal of the district court's "trades or businesses" decision, but has taken no position on the § 1392(c) claim.

II.

A.        Standard of Review

We review a grant or denial of summary judgment, as well as pure issues of law, de novo. Rodriquez v. Am. Int'l Ins. Co. of P.R., 402 F.3d 45, 46-47 (1st Cir. 2005). We may affirm the district court on any independently sufficient ground manifest in the record. OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012). The presence of cross-motions for summary judgment does not distort the standard of review. Rather, we view each motion separately in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Id. We make a determination "based on the undisputed facts whether either [party] deserve[s] judgment as a matter of law." Hartford Fire Ins. Co. v. CNA Ins. Co. (Eur.) Ltd., 633 F.3d 50, 53 (1st Cir. 2011). To prevail, the moving party must show "that there is no genuine dispute as to any material fact," and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

B.        Withdrawal Liability Under the MPPAA

The MPPAA was enacted by Congress to protect the viability of defined pension benefit plans, to create a disincentive for employers to withdraw from multiemployer plans, and also to provide a means of recouping a fund's unfunded liabilities. Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 720-22 (1984). As such, the MPPAA requires employers withdrawing from a multiemployer plan to pay their proportionate

share of the pension fund's vested but unfunded benefits.  See 29 U.S.C. §§ 1381, 1391; Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 609 (1993); R.A. Gray, 467 U.S. at 725.  An employer withdraws when it permanently ceases its obligation to contribute or permanently ceases covered operations under the plan.  29 U.S.C. § 1383(a).

The MPPAA provides: "For purposes of this subchapter, under regulations prescribed by the [PBGC], all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer."  29 U.S.C. § 1301(b)(1).  So, "[t]o impose withdrawal liability on an organization other than the one obligated to the [pension] Fund, two conditions must be satisfied: 1) the organization must be under 'common control' with the obligated organization, and 2) the organization must be a trade or business."  McDougall v. Pioneer Ranch Ltd. P'ship, 494 F.3d 571, 577 (7th Cir. 2007).  The Act's broad definition of "employer" extends beyond the business entity withdrawing from the pension fund, thus imposing liability on related entities within the definition, which, in effect, pierces the corporate veil and disregards formal business structures.  See Cent. States, Se. & Sw. Areas Pension Fund v. Messina Prods., LLC, 706 F.3d 874, 877 (7th Cir. 2013) ("When an employer participates in a multiemployer pension plan and then withdraws from the plan

-17-

with unpaid liabilities, federal law can pierce corporate veils and impose liability on owners and related businesses.").

While Congress in § 1301(b)(1) authorizes the PBGC to prescribe regulations, those regulations "shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under [26 U.S.C. § 414(c)]" of the Internal Revenue Code.[11]  29 U.S.C. § 1301(b)(1).  The PBGC has adopted regulations pertaining to the meaning of "common control," see 29 C.F.R. §§ 4001.2, 4001.3(a), but has not adopted regulations defining or explaining the meaning of "trades or businesses."[12]

The phrase "trades or businesses" as used in § 1301(b)(1) is not defined in Treasury regulations and has not been given a definitive, uniform definition by the Supreme Court. See Comm'r of Internal Revenue v. Groetzinger, 480 U.S. 23, 27 (1987) (observing that despite the widespread use of the phrase in the Internal Revenue Code, "the Code has never contained a definition of the words 'trade or business' for general application, and no regulation has been issued expounding its meaning for all

_____

[11] In turn, § 414(c) is concerned with seven further sections and sub-sections of the Code, which are themselves concerned with qualified pension plans, profit-sharing plans, stock bonus plans, and individual retirement accounts.  See 26 U.S.C. § 414(c); see also id. §§ 401, 408(k), 408(p), 410, 411, 415, 416.

[12] 29 C.F.R. § 4001.3(a) references regulations issued by the Treasury under § 414(c) of the Code, but the Treasury regulations cross-referenced do not define "trades or businesses" either.  See, e.g., 26 C.F.R. § 1.414(c)-2.

purposes"). The Supreme Court has warned that when it interprets the phrase, it "do[es] not purport to construe the phrase where it appears in other places," except those sections where it has previously interpreted the term. Id. at 27 n.8. The Court has not provided an interpretation of the phrase as used in § 1301(b)(1).

C.     Failing to Have Promulgated Regulations, the PBGC Nonetheless Offers Guidance on the Meaning of "Trades or Businesses"

The only guidance we have from the PBGC is a 2007 appeals letter, defended in its amicus brief.

In a September 2007 response to an appeal,[13] the PBGC, in a letter, applied a two-prong test it purported to derive from Commissioner of Internal Revenue v. Groetzinger, 480 U.S. 23, to determine if the private equity fund was a "trade or business" for purposes of the first part of the § 1301(b)(1) requirement. The PBGC asked (1) whether the private equity fund was engaged in an activity with the primary purpose of income or profit and (2) whether it conducted that activity with continuity and regularity. See id. at 35 ("We accept . . . that to be engaged in a trade or business, the taxpayer must be involved in the activity with

---

[13] The PBGC's Appeals Board renders final agency decisions on various liability and benefit determinations in writing pursuant to 29 C.F.R. § 4003.59. According to the PBGC's website, only three-member decisions are made available on its website. The 2007 letter was a one-member decision and was apparently not published, or at least not made widely publicly available through its website. See Pension Benefit Guaranty Corporation, Appeals Board Decisions, http://www.pbgc.gov/prac/appeals-board-decisions.html.

-19-

continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit.").

The PBGC found that the private equity fund involved in that matter met the profit motive requirement. It also determined that the size of the fund, the size of its profits, and the management fees paid to the general partner established continuity and regularity. The PBGC also observed that the fund's agent provided management and advisory services, and received fees for those services. Indeed, the Appeals Board noted that the equity fund's agent, "N," received 20% of all net profits received in exchange for its services and that its acts were attributable to the fund as the fund's agent.[14] In addition, the fund's controlling stake in the portfolio company put it in a position to exercise control through its general partner, consistent with its stated purpose. The approach taken by the PBGC has been dubbed an "investment plus" standard. See Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Palladium Equity Partners, LLC, 722 F. Supp. 2d 854, 869 (E.D. Mich. 2010).

The PBGC does not assert that its 2007 letter is entitled to deference under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). It does, however, claim entitlement to deference under Auer v. Robbins, 519 U.S. 452

---

[14] The letter did not mention whether the equity fund received any offsets to the fees paid to "N" for fees "N" may have received from the portfolio company, i.e., the withdrawing employer.

(1997).  We disagree.  The PBGC's letter stating its position is owed no more than Skidmore deference.  See Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

The letter was not the result of public notice and comment, and merely involved an informal adjudication resolving a dispute between a pension fund and the equity fund.  Thus far, the letter has received no more deference than the power to persuade.  See Sun Capital, 903 F. Supp. 2d at 115; Palladium, 772 F. Supp. 2d at 869.  And rightly so.  "[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' . . . only to the extent that those interpretations have the 'power to persuade.'" Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000) (quoting Skidmore, 323 U.S. at 140).

The PBGC contends that, because it is interpreting a phrase that appears in its own regulations, see 29 C.F.R. §§ 4001.2, 4001.3, its interpretation is owed deference under Auer. Which is to say that the court must defer to that interpretation unless it is plainly erroneous or inconsistent with its own regulations.  Auer, 519 U.S. at 461.

The letter is not owed Auer deference in this case because such deference is inappropriate where significant monetary liability would be imposed on a party for conduct that took place at a time when that party lacked fair notice of the interpretation at issue.  See Christopher v. SmithKline Beecham Corp., 132 S. Ct.

-21-

2156, 2167 (2012).  Christopher stressed that the agency in that case had taken decades before acting, during which time the industry practice at issue developed and continued.[15]  Id. at 2168 ("But where, as here, an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute.").  In this case, the Sun Funds made their investment and operational arrangements in early 2007, while the PBGC did not issue its appeals letter until September 2007.

Moreover, even if Christopher was not an impediment to Auer deference, the anti-parroting principle would be.  Gonzales v. Oregon, 546 U.S. 243, 257 (2006) ("Simply put, the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute.  An agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language.").  The PBGC regulations make no effort to

---

[15]  So too, here.  Private equity funds date back to the nineteenth century, and have grown exponentially since around 1980. N. Jordan et al., Advising Private Funds: A Comprehensive Guide to Representing Hedge Funds, Private Equity Funds, and Their Advisers § 16:2 (2012) (observing that investor commitments were $10 billion in 1991, $160 billion in 2000, and $680 billion in 2008).  And, before the PBGC's appeals letter, many fund managers did not think they were exposed to withdrawal liability for portfolio companies. Id. § 18:5 (explaining also that "the principles set out by the PBGC are likely to apply across a wide spectrum of private equity firms").

-22-

define "trades or businesses," 29 C.F.R. § 4001.3(a), and merely refer to Treasury regulations, which, as mentioned, also do not define the phrase.

Nonetheless, the views the PBGC expressed in the letter are entitled to Skidmore deference. See Skidmore, 323 U.S. at 140 (observing that the "weight" of an agency's determination "depend[s] upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade").

D.    Sun Fund IV is a "Trade or Business" Under § 1301(b)(1), the PBGC's "Investment Plus" Approach is Persuasive, and the Same Approach Would Be Employed Even Without Deference

The Sun Funds argue that the "investment plus" test is incompatible with Supreme Court tax precedent. Regardless, they argue, the Sun Funds cannot be held responsible for the activities of other entities in the management and operation of SBI. And even if the Sun Funds had engaged in those activities, they argue, that would not be enough.

Where the MPPAA issue is one of whether there is mere passive investment to defeat pension withdrawal liability, we are persuaded that some form of an "investment plus" approach is appropriate when evaluating the "trade or business" prong of § 1301(b)(1), depending on what the "plus" is. Further, even if we were to ignore the PBGC's interpretation, we, like the Seventh

-23-

Circuit, would reach the same result through independent analysis. In _Central States, Southeast & Southwest Areas Pension Fund_ v. _Messina Products, LLC_, 706 F.3d 874, the Seventh Circuit employed an "investment plus"-like analysis without reference to any PBGC interpretation. We agree with that approach. We see no need to set forth general guidelines for what the "plus" is, nor has the PBGC provided guidance on this. We go no further than to say that on the undisputed facts of this case, Sun Fund IV is a "trade or business" for purposes of § 1301(b)(1).[16]

In a very fact-specific approach, we take account of a number of factors, cautioning that none is dispositive in and of itself. The Sun Funds make investments in portfolio companies with the principal purpose of making a profit. Profits are made from the sale of stock at higher prices than the purchase price and through dividends. But a mere investment made to make a profit, without more, does not itself make an investor a trade or business. See _Cent. States, Se. & Sw. Areas Pension Fund_ v. _Fulkerson_, 238 F.3d 891, 895-96 (7th Cir. 2001); _Palladium_, 722 F. Supp. 2d at 868.

Here, however, the Sun Funds have also undertaken activities as to the SBI property. The Sun Funds' limited partnership agreements and private placement memos explain that the

---

[16] We do not decide if Sun Fund III is a "trade or business" for reasons discussed later.

Funds are actively involved in the management and operation of the companies in which they invest. Pioneer Ranch, 494 F.3d at 577-78 (observing that an entity's own statements about its goals, purposes, and intentions are "highly relevant, because [they] constitute . . . declaration[s] against interest." (quoting Connors v. Incoal, Inc., 955 F.2d 245, 254 (D.C. Cir. 1993)) (internal quotation mark omitted)). Each Sun Fund agreement states, for instance, that a "principal purpose" of the partnership is the "manag[ement] and supervisi[on]" of its investments. The agreements also give the general partner of each Sun Fund exclusive and wide-ranging management authority.

In addition, the general partners are empowered through their own partnership agreements to make decisions about hiring, terminating, and compensating agents and employees of the Sun Funds and their portfolio companies. The general partners receive a percentage of total commitments to the Sun Funds and a percentage of profits as compensation -- just like the general partner of the equity fund in the PBGC appeals letter.

It is the purpose of the Sun Funds to seek out potential portfolio companies that are in need of extensive intervention with respect to their management and operations, to provide such intervention, and then to sell the companies. The private

placement memos explain that "[t]he Principals[17] typically work to reduce costs, improve margins, accelerate sales growth through new products and market opportunities, implement or modify management information systems and improve reporting and control functions." More specifically, those memos represent that restructuring and operating plans are developed for a target portfolio company even before it is acquired and a management team is built specifically for the purchased company, with "[s]ignificant changes . . . typically made to portfolio companies in the first three to six months." The strategic plan developed initially is "consistently monitored and modified as necessary." Involvement can encompass even small details, including signing of all checks for its new portfolio companies and the holding of frequent meetings with senior staff to discuss operations, competition, new products and personnel.

Such actions are taken with the ultimate goal of selling the portfolio company for a profit. On this point, the placement memos explain that after implementing "significant operating improvements . . . during the first two years[,] . . . the Principals expect to exit investments in two to five years (or sooner under appropriate circumstances)."

---

[17] "Principals" are defined in the private placement memos as individuals who work for the general partner of the Fund.

Further, the Sun Funds' controlling stake in SBI placed them and their affiliated entities in a position where they were intimately involved in the management and operation of the company. See Harrell v. Eller Maritime Co., No. 8:09-CV-1400-T-27AEP, 2010 WL 3835150, at *4 (M.D. Fla. Sept. 30, 2010) (the involvement in decisionmaking at management level goes "well beyond that of a passive shareholder" and supports a conclusion that an organization is a "trade or business"). Through a series of appointments, the Sun Funds were able to place SCAI employees in two of the three director positions at SBI, resulting in SCAI employees controlling the SBI board.[18]

Through a series of service agreements described earlier, SCAI provided personnel to SBI for management and consulting services. Thereafter, individuals from those entities were immersed in details involving the management and operation of SBI, as discussed.

Moreover, the Sun Funds' active involvement in management under the agreements provided a direct economic benefit to at least Sun Fund IV that an ordinary, passive investor would not derive: an offset against the management fees it otherwise would have paid its

---

[18] The Vice President of SSB-LLC, formed by the Sun Funds, selected the board of SBHC. Two of those three board members were employees of SCAI. On February 9, 2007, those same two SCAI employees were named directors of SBI, along with the CEO, Barry Golden, who had been retained after the purchase.

-27-

general partner for managing the investment in SBI.[19]  Here, SBI made payments of more than $186,368.44 to Sun Fund IV's general partner, which were offset against the fees Sun Fund IV had to pay to its general partner.[20]  This offset was not from an ordinary investment activity, which in the Sun Funds' words "results solely in investment returns."  See also United States v. Clark, 358 F.2d 892, 895 (1st Cir. 1966) (holding that taxpayer not engaged in a "trade or business" in part because no evidence he received compensation "different from that flowing to an investor").

In our view, the sum of all of these factors satisfy the "plus" in the "investment plus" test.  The conclusion we reach is consistent with the conclusions of other appellate court decisions, though none has addressed this precise question.  In Messina, where the Seventh Circuit employed an "investment plus"-like analysis on its own, the pension fund was seeking to impose withdrawal liability on a limited liability company (LLC) that owned rental

---

[19] Specifically, the general partner of each private equity fund is entitled to an annual fee of 2% of the aggregate commitments to the fund, but fees the general partner and/or its wholly-owned subsidiary or their officers, partners, or employees receive from other sources are offset against the management fees owed by the Sun Funds to the general partner.

[20] We do not determine if Sun Fund III is a "trade or business" because we cannot tell from the record before us if the Fund received an economic benefit from the offset.  Therefore, we leave that factual issue and the ultimate "trade or business" conclusion about Sun Fund III for the district court to resolve on remand.

property.[21]  706 F.3d at 877.  The Seventh Circuit rejected the LLC's argument that it was a passive investment vehicle.  Id. at 885-86.

The Seventh Circuit looked to the stated intent in the creation of the enterprise, as well as to the enterprise's legal form and how it was treated for tax purposes.[22]  Id. at 885.  The company's operating agreement, which explained that it had developed a business plan to produce, sell, and market gravel, was highly relevant to the court's trade or business inquiry.[23]  Id. at 886 (stating that "[i]t was entirely appropriate for the district court to take these documents at face value").  The court also found it relevant that the activity was conducted "under the auspices of a formal, for-profit organization," id., as are the Sun Funds.

---

[21] The LLC was owned by a couple who also owned the withdrawing employer (a trucking company), establishing common control.  See Cent. States, Se. & Sw. Areas Pension Fund v. Messina Prods., LLC, 706 F.3d 874, 877 (7th Cir. 2013).  The pension fund also sought to impose liability on the couple for owning and renting a separate property to the withdrawing employer.  Id. at 879-80.

[22] Admittedly, here, the Sun Funds did not list trade or business income on their Form 1065, which cuts in favor of the Sun Funds' argument.

[23] As to the couple, the court looked to actions of the couple's agents to impose withdrawal liability on the couple.  Messina, 706 F.3d at 884.  However, to the extent the Seventh Circuit imposed liability because the purpose of the couple's separate rental business was to fractionalize assets of the withdrawing employer, see id. at 883, we do not adopt a rule that in order to impose withdrawal liability the purpose of having a separate "trade or business" must be to fractionalize assets.

Likewise, in an earlier case, the Seventh Circuit rejected an argument that a limited liability company that owned rental property was merely a "personal investment."[24] Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC, 668 F.3d 873, 879 (7th Cir. 2011). It noted that the company was a for-profit LLC, earned rental income, paid business management fees, and contracted with professionals to provide legal, management, and accounting services. Id. Hence, the company was "a formal business organization, engaged in regular and continuous activity for the purpose of generating income or profit and thus is . . . a 'trade or business' for purposes of the MPPAA." Id.

The Sun Funds, however, argue that they cannot be "trades or businesses" because that would be inconsistent with two Supreme Court decisions -- Higgins v. Commissioner of Internal Revenue, 312 U.S. 212 (1941), and Whipple v. Commissioner of Internal Revenue, 373 U.S. 193 (1963) -- which interpret that phrase. The Sun Funds

_____

[24] The court defined "personal investments" as:
[T]hings like holding shares of stock or bonds in publicly traded corporations. Ownership of this type of property "without more is the hallmark of an investment." Owning property can be considered a personal investment, at least where the owner spends a negligible amount of time managing the leases, although a more substantial investment of time may be considered regular and continuous enough to rise to the level of a "trade or business."
Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC, 668 F.3d 873, 878-79 (7th Cir. 2011) (citations omitted) (quoting Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson, 238 F.3d 891, 895 (7th Cir. 2001)).

argue that cases interpreting the phrase "trade or business" as used anywhere in the Internal Revenue Code are binding because Congress intended for that phrase to be a term of art with a consistent meaning across uses. Also, the Sun Funds essentially argue that, by relying on Groetzinger, which stated that it was not cutting back on Higgins, the PBGC's "investment plus" test must be interpreted in a way consistent with Higgins and its progeny. Under Higgins, the Funds contend, they cannot be "trades or businesses."

As to the first argument, we reject the proposition that, apart from the provisions covered by 26 U.S.C. § 414(c), interpretations of other provisions of the Internal Revenue Code are determinative of the issue of whether an entity is a "trade or business" under § 1301(b)(1). Accord United Steelworkers of Am., AFL-CIO & Its Local 4805 v. Harris & Sons Steel Co., 706 F.2d 1289, 1299 (3d Cir. 1983) (explaining that a term used for tax purposes does not have to have the same meaning for purposes of pension fund plan termination insurance). We are particularly convinced this is the case because the Supreme Court has been hesitant to express a uniform definition even within the Code itself. See Groetzinger, 480 U.S. at 27 n.8; see also Carpenters Pension Trust Fund for N. Cal. v. Lundquist, 491 F. App'x 830, 831 (9th Cir. 2012) (rejecting argument that Groetzinger test must be used in interpreting § 1301(b)(1)); Bd. of Trs. of the W. Conference of Teamsters

-31-

<u>Pension Trust Fund</u> v. <u>Lafrenz</u>, 837 F.2d 892 (9th Cir. 1988) (deciding § 1301(b)(1) case without discussing <u>Groetzinger</u>). Moreover, § 1301(b)(1)'s statement that it must be construed consistently with only <u>certain</u> uses of the phrase in the Code undercuts the Sun Funds' assertion that the phrase must be uniformly interpreted.

As to the second argument, we see no inconsistency with <u>Higgins</u> or <u>Whipple</u>. Those cases were concerned with different issues and did not purport to provide per se rules, much less rules determinative of withdrawal liability under the MPPAA. The premise of the Sun Funds' argument is that <u>Higgins</u> and <u>Whipple</u> mean that entities that make investments, manage those investments, and earn only investment returns cannot be "trades or businesses" for any purpose. That argument is too blunt an instrument. In <u>Higgins</u>, the issue was whether certain claimed expenses were eligible for the deduction the taxpayer sought. The taxpayer, who had extensive investments in real estate, bonds, and stocks, spent a considerable amount of effort and time administratively overseeing his interests. 312 U.S. at 213. The taxpayer hired others to assist him and also rented offices to oversee his investments. <u>Id.</u> He claimed those expenses were deductible under Section 23(a) of the Revenue Act of 1932 as ordinary and necessary expenses paid or incurred in carrying on a "trade or business." <u>Id.</u> at 213-14. The Supreme Court held that those expenses were not incurred while

-32-

carrying on a "trade or business" and were therefore not deductible.  Id. at 217-18.

The Supreme Court reasoned that this was true because "[t]he petitioner merely kept records and collected interest and dividends from his securities, through managerial attention for his investments."  Id. at 218.  The Court held that, no matter the size of the estate or the continuous nature of the work required to keep a watchful eye on investments, that by itself could not constitute a "trade or business."  Id.  Significantly, the Court noted that the taxpayer "did not participate directly or indirectly in the management of the corporations in which he held stock or bonds."  Id. at 214.

The facts of this case are easily distinguishable from those of Higgins.  See id. at 217 ("To determine whether the activities of a taxpayer are 'carrying on a business' requires an examination of the facts in each case.").  First, the taxpayer in Higgins was trying to claim a deduction to avoid paying taxes. Second and more important, unlike the investor in Higgins, the Sun Funds did participate in the management of SBI, albeit through affiliated entities.[25]

---

[25] Higgins stated that the size of the portfolio and the amount of time making investment decisions and taking care of administrative matters does not transform an investor into a "trade or business"; we do not rely on those factors in our analysis.

Whipple is also distinguishable: The taxpayer there sought to deduct a worthless loan made to a business he controlled as a bad business debt incurred in the taxpayer's "trade or business." 373 U.S. at 194-97. The taxpayer claimed that, because he furnished regular services, namely his time and energy to the affairs of the corporation, he was engaged in a "trade or business." Id. at 201-02. The Supreme Court rejected the argument, stating:

> Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. Though such activities may produce income, profit or gain in the form of dividends or enhancement in the value of an investment, this return is distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer himself. When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business since investing is not a trade or business and the return to the taxpayer, though substantially the product of his services, legally arises not from his own trade or business but from that of the corporation.

Id. at 202 (emphasis added). The Sun Funds say that, because they earned no income other than dividends and capital gains, they are not "trades or businesses." But the Sun Funds did not simply devote time and energy to SBI, "without more." Rather, they were able to funnel management and consulting fees to Sun Fund IV's general partner and its subsidiary. Most significantly, Sun Fund

-34-

IV received a direct economic benefit in the form of offsets against the fees it would otherwise have paid its general partner. It is difficult to see why the Whipple "without more" formulation is inconsistent with an MPPAA "investment plus" test.

The "investment plus" test as we have construed it in this opinion is thus consistent with the Groetzinger, Higgins, and Whipple line of cases.[26]  Cf. SCOFBP, 668 F.3d at 878 ("[I]t seems highly unlikely that a formal for-profit business organization would not qualify as a 'trade or business' under the Groetzinger test."); Rosenthal, Taxing Private Equity Funds as Corporate 'Developers', at 365 ("[P]rivate equity funds are active enough to be in a trade or business.").

The Sun Funds make an additional argument: that because none of the relevant activities by agents and different business entities can be attributed to the Sun Funds themselves, withdrawal liability cannot be imposed upon them.  We reject this argument as well.  Without resolving the issue of the extent to which Congress

_____

[26] Very late in this case the TPF, for the first time, argued that a series of tax cases from the tax court supported its view that the Sun Funds are "trades or businesses" because they are engaged in the development, promotion, and sale of companies.  The TPF cites Deely v. Commissioner of Internal Revenue, 73 T.C. 1081 (1980), Farrar v. Commissioner of Internal Revenue, 55 T.C.M. (CCH) 1628 (1988), and Dagres v. Commissioner of Internal Revenue, 136 T.C. 263 (2011).  The argument was presented too late.  The "developing business enterprises for resale" theory was not presented to the district court nor in the opening briefs to us. Whatever the merit of the theory, our decision does not engage in an analysis of it.

intended in this area to honor corporate formalities, as have the parties, we look to the Restatement of Agency.  Cf. Vance v. Ball State Univ., 133 S. Ct. 2434, 2441 (2013) (looking to Restatement of Agency to decide when Title VII vicarious liability appropriate).  And, because the Sun Funds are Delaware limited partnerships, we also look to Delaware law.

Under Delaware law, a partner "is an agent of the partnership for the purpose of its business, purposes or activities," and an act of a partner "for apparently carrying on in the ordinary course of the partnership's business, purposes or activities or business, purposes or activities of the kind carried on by the partnership binds the partnership."  Del. Code Ann. tit. 6, § 15-301(1); see also Comm'r of Internal Revenue v. Boeing, 106 F.2d 305, 309 (9th Cir. 1939) ("One may conduct a business through others, his agents, representatives, or employees.").  To determine what is "carrying on in the ordinary course" of the partnership's business, we may consider the partnership's stated purpose. Rudnitsky v. Rudnitsky, No. 17446, 2010 WL 1724234, at *6 (Del. Ch. Nov. 14, 2000).

Here, the limited partnership agreements gave the Sun Funds' general partners the exclusive authority to act on behalf of the limited partnerships to effectuate their purposes.[27]  These

---

[27] The Sun Funds try to divert our attention from the Sun Funds' limited partnership agreements and instead focus on the purposes of the general partners as provided in their partnership

purposes included managing and supervising investments in portfolio companies, as well as "other such activity incidental or ancillary thereto" as deemed advisable by the general partner. So, under Delaware law, it is clear that the general partner of Sun Fund IV, in providing management services to SBI, was acting as an agent of the Fund.

Moreover, even absent Delaware partnership law, the partnership agreements themselves grant actual authority for the general partner to provide management services to portfolio companies like SBI. See Restatement (Third) of Agency §§ 2.01, 3.01; cf. id. § 7.04 (principal incurs tort liability vicariously where agent acts with actual authority). And the general partners' own partnership agreements giving power to the limited partner committee to make determinations about hiring, terminating, and compensating agents and employees of the Sun Funds and their portfolio companies show the existence of such authority. Hence, the general partner was acting within the scope of its authority.

Even so, the Sun Funds argue that the general partner entered the management service contract with SBI on its own accord, not as an agent of the Sun Funds.[28] The Sun Funds' own

_____

agreements. But it is the principal's purposes, i.e., the Sun Funds' purposes, that are relevant.

[28] The Sun Funds' citation of the Restatement (Third) of Agency's comment that "[a]n agent may enter into a contract on behalf of a disclosed principal and, additionally, enter into a separate contract on the agent's own behalf with the same third

-37-

characterization is not dispositive.[29] Cf. Restatement (Third) of Agency § 1.02 cmt. a (stating "how the parties to any given relationship label it is not dispositive").

The argument is unpersuasive for at least two reasons. First, it was within the general partner's scope of authority to provide management services to SBI.  Second, providing management services was done on behalf of and for the benefit of the Sun Funds.  Cf. Messina, 706 F.3d at 884 (individuals acting for benefit of married couple are agents whose acts are attributable to the couple).  The investment strategy of the Sun Funds could only be achieved by active management through an agent, since the Sun Funds themselves had no employees.  Indeed, the management services agreement was entered into just one day after the execution of the stock purchase agreement.  In addition, Sun Fund IV received an offset in the fees it owed to its general partner because of payments made from SBI to that general partner.  That provided a

_____

party," is unpersuasive. Restatement (Third) of Agency § 6.01 cmt. b.  In that comment, the Restatement is explaining that an agent may enter into a contract that binds the agent and not the principal even where there is a separate contract which the agent entered into on behalf of the principal.  That is not the case here where there is just one contract to provide management services to SBI.  Additionally, in the illustration that follows, the agent permissibly enters into a second contract with the same third party in an area outside the scope of his agency.  Again, that is not the case here where it was within the scope of authority for the general partner of Sun Fund IV to manage the investment in SBI.

[29] Likewise, the fact that the general partner did not sign the management services agreement with SBI explicitly on behalf of Sun Fund III or Sun Fund IV is not determinative.

benefit by reducing its expenses.  The services paid for by SBI were the _same services_ that the Sun Funds would otherwise have paid for themselves to implement and oversee an operating strategy at SBI.[30]

The Sun Funds also make a policy argument that Congress never intended such a result in its § 1301(b)(1) control group provision.  They argue that the purpose of the provision is to prevent an employer "from circumventing ERISA obligations by divvying up its business operations into separate entities."  It is _not_, they say, intended to reach owners of a business so as to require them to "dig into their own pockets" to pay withdrawal liability for a company they own.  See _Messina_, 706 F.3d at 878.

These are fine lines.  The various arrangements and entities meant precisely to shield the Sun Funds from liability may be viewed as an attempt to divvy up operations to avoid ERISA obligations.  We recognize that Congress may wish to encourage investment in distressed companies by curtailing the risk to investors in such employers of acquiring ERISA withdrawal liability.  If so, Congress has not been explicit, and it may

---

[30] Contrary to the Sun Funds' argument, attributing activities of an agent to a principal to determine if the principal is engaged in a "trade or business" does not result in the principal assuming the status of the agent.  That is too simplistic of a way to view the inquiry.  Instead, "the court must attribute the _activities_ of an agent that is acting on behalf of a principal to the principal, to determine whether there are sufficient activities of the principal to constitute a trade or business."  Rosenthal, _Taxing Private Equity Funds as Corporate 'Developers'_, at 365 n.43.

prefer instead to rely on the usual pricing mechanism in the private market for assumption of risk.

We express our dismay that the PBGC has not given more and earlier guidance on this "trade or business" "investment plus" theory to the many parties affected. The PBGC has not engaged in notice and comment rulemaking or even issued guidance of any kind which was subject to prior public notice and comment. See C. Sunstein, Simpler 216 (2013) ("[G]overnment officials learn from public comments on proposed rules. . . . It is not merely sensible to provide people with an opportunity to comment on rules before they are finalized; it is indispensable, a crucial safeguard against error."). Moreover, its appeals letter that provides for the "investment plus" test leaves open many questions about exactly where the line should be drawn between a mere passive investor and one engaged in a "trade or business."

Because to be an "employer" under § 1301(b)(1) the entity must both be a "trade or business" and be under common control, we reverse entry of summary judgment on the § 1301(b)(1) claim in favor of Sun Fund IV and vacate the judgment in favor of Sun Fund III. We remand the § 1301(b)(1) claim of liability to the district court to resolve whether Sun Fund III received any benefit from an offset from fees paid by SBI and for the district court to decide the issue of common control. We determine only that the "trade or business" requirement has been satisfied as to Sun Fund IV.

We deny, for different reasons than the district court, the TPF's appeal from entry of summary judgment against its claim under 29 U.S.C. § 1392(c). That provision of the MPPAA states "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) <u>without regard to such transaction</u>." 29 U.S.C. § 1392(c) (emphasis added).

The TPF argues that § 1392(c) applies because the Sun Funds, during the acquisition, purposefully divided ownership of SSB-LLC into 70%/30% shares in order to avoid the 80% parent-subsidiary common control requirement of § 1301(b)(1). Under Treasury regulations, to be in a parent-subsidiary group under common control, the parent must have an 80% interest in the subsidiary. 26 C.F.R. § 1.414(c)-2(b)(2)(i). The TPF asserts that, because a Sun Fund representative testified that a principal purpose of the 70%/30% division was to avoid unfunded pension liability and because an email states that a reason ownership was divided was "due to [the] unfunded pension liability," liability can be imposed on the Sun Funds under § 1392(c).[31]

---

[31] The claim raises a number of issues that we need not address. We do not decide whether an agreement between Sun Fund III and Sun Fund IV can be considered a "transaction." Nor do we decide whether, as the district court found, § 1392(c) can serve as an independent basis for liability even if none were to exist under § 1301(b)(1) (that is, that the Sun Funds need not first be "trades or businesses"). We also need not resolve whether an outside

We hold that § 1392(c) cannot serve as a basis to impose liability on the Sun Funds because, by applying the remedy specified by the statute, the TPF would still not be entitled to any payments from the Sun Funds for withdrawal liability. We begin (and ultimately end) our analysis by reviewing the plain language of § 1392(c). See United States v. Kelly, 661 F.3d 682, 687 (1st Cir. 2011) ("We begin our analysis by reviewing the plain language of the [statute].").

The language of § 1392(c) instructs courts to apply withdrawal liability "without regard" to any transaction the principal purpose of which is to evade or avoid such liability. 29 U.S.C. § 1392(c). The instruction requires courts to put the parties in the same situation as if the offending transaction never occurred; that is, to erase that transaction. It does not, by contrast, instruct or permit a court to take the affirmative step of writing in new terms to a transaction or to create a transaction that never existed. In order for the TPF to succeed, we would have to (improperly) do the latter because simply doing the former would not give the TPF any relief, but would only sever any ties between the Sun Funds and SBI.

Disregarding the agreement to divide SSB-LLC 70%/30% would not result in Sun Fund IV being the 100% owner of SBI. At

---

investor who structures an investment in a manner to avoid assuming unfunded pension liabilities can ever be held to be evading or avoiding withdrawal liability.

the moment SSB-LLC was divided 70%/30%, the transaction to purchase SBI had not been completed. There is no way of knowing that the acquisition would have happened anyway if Sun Fund IV were to be a 100% owner, but it is doubtful. SSB-LLC was formed on December 15, 2006, at which point the 70%/30% division became official. SBI did not enter into a stock purchase agreement to be acquired until February 8, 2007. In essence, the TPF requests that we create a transaction that never occurred -- a purchase by Sun Fund IV of a 100% stake in SBI. But as stated, that we cannot do. Cf. Teamsters Pension Trust Fund of Phila. & Vicinity v. Cent. Mich. Trucking, Inc., 857 F.2d 1107, 1109 (6th Cir. 1988) ("There is no congressional mandate to engage in legal gymnastics in order to guarantee pension plans at all costs[,] . . . or to apply the statute in a nonsensical fashion in order to assure full payment of withdrawal liability."). Moreover, the TPF does not provide a single case in which a court created a fictitious transaction in order to impose § 1392(c) liability.

The TPF argues that because Sun Fund IV had already signed a letter of intent to purchase 100% of SBI before the decision was made to divide ownership between the Sun Funds, we can rely on the letter of intent. The TPF claims that the decision to split ownership to avoid the automatic assumption of withdrawal liability at 80% ownership was made after a binding transaction was entered into through the letter of intent. That is not true. The

-43-

letter of intent was so named because it was not a binding contract or any sort of purchase agreement. Rather, the letter explicitly contained a clause stating that:

> The first five captioned paragraphs of this letter ('Purchase Price', 'Purchase Agreement Terms', 'Financing', 'Timing & Process', and 'Due Diligence') represent only the intent of the parties, do not constitute a contract or agreement, are not binding, and shall not be enforceable against the Sellers, the Company, or Sun Capital. . . . [N]either party shall have any legally binding obligation to the other unless and until a definitive purchase agreement is executed.

This is simply not a case about an entity with a controlling stake of 80% or more under the MPPAA seeking to shed its controlling status to avoid withdrawal liability. As such, disregarding the agreement to divide ownership of SSB-LLC would <u>not</u> leave us with Sun Fund IV holding a controlling 80% stake in SBI.

The Sun Funds are not subject to liability pursuant to § 1392(c) and the district court's conclusion that they are not is affirmed.

IV.

Accordingly, the district court's grant of summary judgment is <u>reversed in part</u>, <u>vacated in part</u>, and <u>affirmed in part</u>. The case is remanded to the district court for further proceedings, including those needed to determine the "trade or business" issue as to Sun Fund III, and the issue of common control. <u>So ordered</u>. No costs are awarded.