# United States Court of Appeals
## For the First Circuit

Nos. 16-1376
     19-1002

SUN CAPITAL PARTNERS III, LP; SUN CAPITAL PARTNERS III QP, LP;
SUN CAPITAL PARTNERS IV, LP,

Plaintiffs, Appellants,

v.

NEW ENGLAND TEAMSTERS & TRUCKING INDUSTRY PENSION FUND,

Defendant, Third Party Plaintiff, Appellee,

SCOTT BRASS HOLDING CORP.; SUN SCOTT BRASS, LLC,

Third Party Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Stahl, and Lipez,
Circuit Judges.

John C. O'Quinn, with whom John F. Hartmann, Devin A.
DeBacker, Kirkland & Ellis LLP, Theodore J. Folkman, and Pierce
Bainbridge Beck Price & Hecht LLP, were on brief for appellants.
Catherine M. Campbell, with whom Melissa A. Brennan, Renee J.
Bushey, and Feinberg, Campbell & Zack, PC were on brief for
appellee.
Craig T. Fessenden, with whom Judith R. Starr, Kartar S.
Khalsa, Charles L. Finke, and Louisa A. Soulard were on brief for
Pension Benefit Guaranty Corporation, amicus curiae.

November 22, 2019

**LYNCH**, **Circuit Judge**.  The issue on appeal is whether two private equity funds, Sun Capital Partners III, LP ("Sun Fund III") and Sun Capital Partners IV, LP ("Sun Fund IV"), are liable for $4,516,539 in pension fund withdrawal liability owed by a brass manufacturing company which was owned by the two Sun Funds when that company went bankrupt.  The liability issue is governed by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").  Under that statute, the issue of liability depends on whether the two Funds had created, despite their express corporate structure, an implied partnership-in-fact which constituted a control group.  That question, in the absence of any further formal guidance from the Pension Benefit Guaranty Corporation ("PBGC"), turns on an application of the multifactored partnership test in Luna v. Commissioner, 42 T.C. 1067 (1964).

If the MPPAA imposes such withdrawal liability, PBGC states it assumes the New England Teamsters & Trucking Industry Pension Fund ("Pension Fund") intends to look to the private equity funds, including their general partners and their limited partners, to pay the liability.  The issues raised involve conflicting policy choices for Congress or PBGC to make.  On one hand, imposing liability would likely disincentivize much-needed private investment in underperforming companies with unfunded pension liabilities.  This chilling effect could, in turn, worsen the financial position of multiemployer pension plans.  On the

- 3 -

other hand, if the MPPAA does not impose liability and the Pension Fund becomes insolvent, then PBGC likely will pay some of the liability, and the pensioned workers (with 30 years of service) will receive a maximum of $12,870 annually. See 18 U.S.C. § 1322a.

The district court held that there was an implied partnership-in-fact which constituted a control group. We reverse because we conclude the Luna test has not been met and we cannot conclude that Congress intended to impose liability in this scenario.

I.

We describe the facts as to the organizational structures of the Sun Funds[1] and related entities. We also refer to the facts set forth in our previous opinion in Sun Capital Partners III, LP v. New England Teamsters & Trucking Industry Pension Fund, 724 F.3d 129, 135 n.3 (1st Cir. 2013) (Sun Capital II). The two Sun Funds are each distinct business entities with primarily different investors and investments. But they are controlled by the same two men, and they coordinate to identify, acquire, restructure, and sell portfolio companies. The Funds

---

[1]    Sun Fund III and Sun Fund IV are collectively referred to as the "Sun Funds" or "Funds." Sun Fund III technically comprises two funds: Sun Capital Partners III, LP and Sun Capital Partners III QP, LP. Because these are parallel funds, share a single general partner, and invest nearly identically, we treat them as one entity, as we did in Sun Capital Partners III, LP v. New England Teamsters & Trucking Industry Pension Fund, 724 F.3d 129, 135 n.3 (1st Cir. 2013).

form and finance subsidiary LLCs, through which they acquire and control portfolio companies, including Scott Brass, Inc. ("SBI"), the brass manufacturing company. While the Funds jointly owned SBI, it filed for bankruptcy and subsequently withdrew from the Pension Fund, a multiemployer pension fund, incurring withdrawal liability.[2] We restate here only certain facts, and then briefly give a procedural history of the litigation leading to the instant appeal.

A.    The Organization of the Sun Funds

Sun Capital Advisors, Inc. ("SCAI") is a private equity firm which pools investors' capital in limited partnerships, assists these limited partnerships in finding and acquiring portfolio companies, and then provides management services to those portfolio companies. SCAI established at least eight funds. Two of them, Sun Fund III and Sun Fund IV, appellants here, are the investors in SBI, and both are organized under Delaware law as

---

[2]    The price of copper dropped in 2008, reducing the value of SBI's inventory, which caused a breach of SBI's loan covenants. This prevented SBI from accessing credit and paying its bills, causing its bankruptcy and subsequent withdrawal from the Pension Fund. Sun Capital II, 724 F.3d at 136. There is no suggestion that mismanagement of SBI by the Funds caused, or even contributed to, the bankruptcy. It is clear that declining copper prices, likely a product of the global recession, caused SBI's bankruptcy. The Funds' acquisition of SBI may have prolonged the operation of SBI, and so lengthened the employment of its employees, but there is no evidence of how the Funds' investment in SBI impacted the company. There is also no indication that SBI employees had any alternative retirement savings vehicles (e.g., a 401(k) plan).

limited partnerships.  The Sun Funds themselves do not have offices or employees, do not make or sell goods, and report to the IRS only investment income.  The Funds expressly disclaimed in their respective limited partnership agreements any partnership or joint venture with each other.  The Funds also maintained distinct tax returns, financial books, and bank accounts.

Sun Funds III and IV each have one general partner, Sun Capital Advisors III, LP and Sun Capital Advisors IV, LP, respectively.  These general partners each own respective subsidiary management companies, Sun Capital Partners Management III, LLC ("SCPM III") and Sun Capital Partners Management IV, LLC ("SCPM IV").  The two management companies act as intermediaries between SCAI and holding companies.  The management companies contract with SCAI for the management services of SCAI's employees and consultants, and then with the holding company to provide these management services.

Sun Funds III and IV, respectively, have 124 and 230 limited partners.  Sixty-four of these limited partners overlap between the Funds.  The limited partners include both individual and institutional investors, including pension funds, other private equity funds, family trusts, and universities.[3]  The Sun

---

[3]     The identities of the limited partners remain under seal.

Funds' limited partnership agreements vest exclusive control of the Funds in their respective general partners, assign the general partners percentages of the Funds' total commitments and investment profits, and require the Funds to pay their general partners an annual management fee.[4] The Sun Funds' general partners, which are themselves organized as limited partnerships, have limited partnership agreements, which vest exclusive control over the general partners' "material partnership decisions" in limited partnership committees. These limited partnership committees are each made up of two individuals, Marc Leder and Rodger Krouse. These two men also founded and serve as the co-CEOs and sole shareholders of SCAI. Leder and Krouse were the co-

---

[4] The Sun Funds owe to their general partners an annual management fee equal to two percent of their total commitments. A general partner may waive these fees to receive "waived fee amounts," which reduce its capital obligations in the event of a Sun Fund's future capital call. Additionally, the Sun Funds receive an offset to the fees they owe their general partners commensurate to a portion of the fees the portfolio companies pay the management companies. When a Fund's management fee offsets exceed its management fees owed in a six-month period, it receives a "carryforward" that may offset the fees owed in the subsequent six-month period.

The district court quite properly found Sun Fund III's fee waivers and Sun Fund IV's carryforwards to be direct economic benefits because they each provided either current, or potential future, financial benefits that a passive investor would not accrue. Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund, 172 F. Supp. 3d 447, 453–54 (D. Mass. 2016) (Sun Capital III).

CEOs of the management company SCPM IV.[5]

B.   The Operation of the Sun Funds and SBI

The Funds used their controlling share of portfolio companies "to implement restructuring and operational plans, build management teams, become intimately involved in company operations, and otherwise cause growth in the portfolio companies." Sun Capital II, 724 F.3d at 134. The Sun Funds owned and managed their acquisitions through various corporate intermediaries. The Sun Funds together sought out potential portfolio companies and, through SCAI, developed restructuring and operating plans before acquisition. The Sun Funds then would attempt to sell a portfolio company for a profit, typically within two to five years of acquisition. The Sun Funds would acquire, restructure, and sell companies both independently and together.[6]

As part of their acquisition of SBI, the Sun Funds formed and financed Sun Scott Brass, LLC ("SSB-LLC"). Sun Fund III owned 30% of SSB-LLC and Sun Fund IV owned 70% of SSB-LLC. These shares reflect Sun Fund III investing $900,000 and Sun Fund IV investing $2.1 million in SSB-LLC. SSB-LLC in turn formed and financed Scott

---

[5]   The record does not include SCPM III's Limited Liability Company Agreement, and so does not set forth the identity of SCPM III's executives.

[6]   The record shows that Sun Funds III and IV held interests in eighty-eight entities at the relevant times, of which only seven overlapped. Only the ownership of SBI is at issue here.

Brass Holding Corporation ("SBHC"), a wholly owned, subsidiary holding company. SBHC used the Sun Funds' $3 million investment in SSB-LLC and $4.8 million in debt to purchase all of SBI's stock. The purchase price reflected a 25% discount from the fair market value of the SBI stock at acquisition to account for SBI's known, unfunded pension liability. The Funds, through SCAI employees placed in SBI, jointly operated SBI.

C.   Procedural History

In Sun Capital II, we remanded to the district court to determine whether the Funds were under common control with SBI and whether Sun Fund III engaged in trade or business.[7] 724 F.3d at 150. It determined that the Sun Funds had formed a partnership-in-fact sitting on top of SSB-LLC and that this partnership-in-fact owned 100% of SBI through SSB-LLC, and so concluded the Funds met the "common control" test utilized in MPPAA law. Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund, 172 F. Supp. 3d 447, 463–66 (D. Mass. 2016). That test is derived from tax law. See 26 C.F.R. § 1.414(c)-2(b); 29 C.F.R. §§ 4001.2, 4001.3(a) (incorporating regulations promulgated under 26 U.S.C. § 414(c)). The district court held that this

_____

[7]   On remand, the district court held that Sun Fund III engaged in trade or business. Sun Capital III, 172 F. Supp. 3d at 454–55. The Funds acknowledge that our decision in Sun Capital II controlled this holding and do not challenge it on appeal. But the Funds "reserve the right to seek further review of this . . . decision."

- 9 -

partnership-in-fact engaged in "trade or business" in its operation of SBI. Sun Capital III, 172 F. Supp. 3d at 466–67. Accordingly, the district court held the Sun Funds jointly and severally responsible for SBI's withdrawal liability. Id. at 467.

The Sun Funds appealed the rulings that they were under common control with SBI, that they formed a partnership-in-fact, and, if a partnership-in-fact did exist, that it engaged in trade or business. PBGC filed an amicus brief in support of the district court ruling.

II.

A.   Standard of Review

This case reaches the court on appeal from a grant of summary judgment. "We review a grant or denial of summary judgment, as well as pure issues of law, de novo." Sun Capital II, 724 F.3d at 138 (citing Rodriguez v. Am. Int'l Ins. Co. of P.R., 402 F.3d 45, 46–47 (1st Cir. 2005)). This includes both the determination of withdrawal liability and the recognition of a partnership-in-fact. See Pension Ben. Guar. Corp. v. Beverley, 404 F.3d 243, 246, 250–53 (4th Cir. 2005). Because the parties filed cross-motions for summary judgment, we "view each motion, separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Can., 684 F.3d 237, 241 (1st Cir. 2012) (internal quotation marks

omitted).

B.   Withdrawal Liability under the MPPAA

Congress enacted the MPPAA to ensure defined pension benefit plans remain viable, dissuade employers from withdrawing from multiemployer plans, and enable a pension fund to recoup any unfunded liabilities.  See PBGC v. R.A. Gray & Co., 467 U.S. 717, 720-22 (1984).   An employer completely withdraws from a multiemployer plan when it "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).  On withdrawal, an employer must pay its proportionate share of the plan's "unfunded vested benefits."  Id. § 1391; see also id. § 1381; Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 608-11 (1993); Sun Capital II, 724 F.3d at 138.

To prevent evasion of the payment of withdrawal liability, the MPPAA imposes joint and several withdrawal liability not only on the withdrawing employers but also on all entities (1) under "common control" with the obligated organization (2) that qualify as engaging in "trade or business." 29 U.S.C. § 1301(b)(1); see also Sun Capital II, 724 F.3d at 138. The imposition by Congress of withdrawal liability on commonly controlled group members can have the beneficial effect of delaying or preventing pension plans from becoming insolvent, preventing

- 11 -

reductions in pension benefits, and limiting claims on public monies, i.e., PBGC's multiemployer insurance fund. See PBGC v. Dickens (In re Challenge Stamping & Porcelain Co.), 719 F.2d 146, 150 (6th Cir. 1983).

C.   Common Control

The MPPAA's "common control" provision exists to prevent the "shirking [of] ERISA obligations by fractionalizing operations into many separate entities." Cent. States Se. & Sw. Areas Pension Fund v. Messina Prods., LLC, 706 F.3d 874, 878 (7th Cir. 2013) (quoting Cent. States, Se. & Sw. Areas Pension Fund v. White, 258 F.3d 636, 644 (7th Cir. 2001)). ERISA, of which the MPPAA is a part, as a remedial statute, is to be construed liberally. Teamsters Pension Tr. Fund-Bd. of Trs. of W. Conference v. Allyn Transp. Co., 832 F.2d 502, 507 (9th Cir. 1987). We have held, in consequence, that the common control provision "in effect, pierces the corporate veil and disregards formal business structures." Sun Capital II, 724 F.3d at 138. And other circuits which have addressed the question agree. See Messina, 706 F.3d at 877 (holding that the MPPAA can "pierce corporate veils and impose [withdrawal] liability on owners and related businesses"); Ceco Concrete Constr., LLC, v. Centennial State Carpenters Pension Tr., 821 F.3d 1250, 1260 (10th Cir. 2016) (holding the same). The legislative history is also consistent with this view. See S. Rep. No. 383, at 43 (1974) ("[T]he committee, by [§ 1301(b)],

- 12 -

intends to make it clear that the . . . provisions cannot be avoided by operating through separate corporations instead of separate branches of one corporation."); H.R. Rep. No. 807, at 50 (1974) (same).

In 1986, Congress authorized PBGC to promulgate regulations for implementing the common control provision "consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c) of Title 26" of the Internal Revenue Code. 29 U.S.C. § 1301(b)(1).

The MPPAA regulations adopted in 1996 by PBGC, in turn, adopt the Treasury Department's regulations governing "common control." The regulations state that entities are under common control if they are members of a "parent-subsidiary group of trades or business under common control."[8] 26 C.F.R. § 1.414(c)-2(b); 29 C.F.R. §§ 4001.2, 4001.3(a) (incorporating Treasury regulations under 26 U.S.C. § 414(c)). Notably, PBGC has not provided the courts or parties with any further formal guidance on how to determine common control specifically in the MPPAA context. Nor has PBGC updated its regulation on common control, 29 C.F.R. § 4001.3, since that regulation's adoption.

---

[8] There are also regulations defining "brother-sister groups of trades or businesses under common control," but these are not relevant to this appeal. See 26 C.F.R. § 1.414(c)-2(c).

The Treasury regulations[9] define a "parent-subsidiary group" under the term "parent-subsidiary groups of trades or businesses under common control" as:

> one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization if . . . (i) [a] controlling interest in each of the organizations, except the common parent organization, is owned . . . by one or more of the other organizations; and (ii) [t]he common parent organization owns . . . a controlling interest in at least one of the other organizations.

26 C.F.R. § 1.414(c)-2(b)(1).

Treasury regulations also establish that there is a "controlling interest" if there is "ownership of stock possessing at least 80 percent of total combined voting power . . . or at least 80 percent of the total value of shares."  Id. § 1.414(c)-2(b)(2)(A).  The plain language of these provisions requires us to find, and ascribe liability to, the entity that controls (by at least 80%) the withdrawn employer.  See Dickens, 719 F.2d at 151 ("The purpose of the 80% regulation is obviously to find the party in control.").

D.   Federal Partnership Law

Like the district court, we inquire into the legal

---

[9]   We also do not engage the Funds' argument that we should consider interpreting present Treasury regulations in light of the fate of earlier IRS regulations concerning partnerships and corporations which were rejected by some circuits.

question of whether the record demonstrates the Funds formed a partnership-in-fact, as a matter of federal common law, to acquire and operate SBI through SSB-LLC.

We must look to federal tax law on the partnership-in-fact issue. We do so because Congress "intended that a body of Federal substantive law [would] be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans." Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 156 (1985) (quoting Remarks of Senator Javits, 120 Cong. Rec. 29,942 (1974)); Bd. of Trs. of W. Conference of Teamsters Pension Tr. Fund v. H.F. Johnson, Inc., 830 F.2d 1009, 1014 (9th Cir. 1987) (quoting the same with respect to MPPAA withdrawal liability). Moreover, by statute, PBGC's "common control" regulations must be "consistent and coextensive" with treasury regulations under § 414(c). 29 U.S.C. § 1301(b)(1). These treasury regulations incorporate federal tax law's definition of partnership. 26 C.F.R. § 1.414(c)-2(a) (referencing 26 U.S.C. § 7701(a)(2)). And courts facing similar issues have relied on federal tax law. See, e.g., Connors v. Ryan's Coal Co., Inc., 923 F.2d 1461, 1466-67, 1467 n.37 (11th Cir. 1991) (relying on federal tax precedent to affirm recognition of a partnership and holding one of the partners responsible for the other partner's withdrawal liability).

Federal tax law provides that the choice(s) of organizational form under state law does not control this question

- 15 -

of whether a partnership-in-fact was established.  See Comm'r v. Tower, 327 U.S. 280, 287-88 (1946) (holding that federal law governs whether parties formed partnership for tax purposes); H.F. Johnson, Inc., 830 F.2d at 1014 (concluding that federal law governed whether parties formed a partnership and so were liable for pension withdrawal under ERISA).  But state law, and express disclaimers of partnership formation that are determinative under state law, do provide some guidance.  H.F. Johnson, Inc., 830 F.2d at 1014 (holding that, "while [a court] may look to state law for guidance," federal law governs whether joint venturers share withdrawal liability).

The Internal Revenue Code defines a "partnership" to include "a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation."  26 U.S.C. § 7701(a)(2) (emphasis added).  It similarly defines "partner" to include "a member in such a syndicate, group, pool, joint venture, or organization."  Id.

We look to the partnership[10] factors the Tax Court

_____

[10]    A joint venture differs from a partnership primarily in scope, see Podell v. Comm'r, 55 T.C. 429, 432 (1970), and the differences do not affect our analysis.  Consequently, and like the district court and parties to this case, we employ the terms "partner" and "partnership" in our analysis.

adopted in Luna.  42 T.C. at 1077-78.  The factors are:

1. "The agreement of the parties and their conduct in executing its terms";

2. "the contributions, if any, which each party has made to the venture";

3. "the parties' control over income and capital and the right of each to make withdrawals";

4. "whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income";

5. "whether business was conducted in the joint names of the parties";

6. "whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers";

7. "whether separate books of account were maintained for the venture"; and

8. "whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise."

Id.

To the extent the Funds argue we cannot apply the Luna factors because they have organized an LLC through which to operate SBI, we reject the argument. Merely using the corporate form of a limited liability corporation cannot alone preclude courts recognizing the existence of a partnership-in-fact. There is precedent for recognizing a partnership-in-fact where the parties have formed a different entity through an express agreement. Wabash Railway Co. v. American Refrigerator Transit Co., 7 F.2d 335, 342–44 (8th Cir. 1925), cert. denied, 270 U.S. 643 (1926), and Shorb v. Beaudry, 56 Cal. 446, 450 (1880), do just that. See also In re Hart, Nos. 09-71053, 11-42424, 2014 WL 1018087, at *20 n.11 (Bankr. N.D. Cal. Mar. 14, 2014) ("Shorb [v. Beaudry], though dated, is still authority in California."). Given our understanding, we also reject the separate argument made by the Funds that the question of liability is resolved by the district court's conclusion that "[t]he conventional theories of a general partnership -- those that on the face reflect operational and institutional overlap between the Funds -- are not evident here." Sun Capital III, 172 F. Supp. 3d at 463.

If the Funds have, under this multi-factored Luna test, formed a partnership-in-fact, then under the common control regulations they are jointly and severally liable for the debts of the partnership, including MPPAA withdrawal liability, if the separate trade or business test is also met. E.g., Cent. States,

- 18 -

Se. & Sw. Areas Pension Fund v. Johnson, 991 F.2d 387, 391–92 (7th Cir. 1993).

Importantly, federal common law[11] allows a pre-incorporation venture or partnership to survive the fact of the partners incorporating. See Wabash Ry., 7 F.2d at 342–44; cf. Chi., Milwaukee & St. Paul Ry. Co. v. Minn. Civic & Commerce Ass'n, 247 U.S. 490, 498 (1918) (holding, for the purposes of a regulatory regime, that a "technically . . . separate," subsidiary corporation was "a mere agency or instrumentality" of the two railway corporations that wholly controlled it). That is, under federal law, if entities have in fact formed a partnership, merely creating a corporation through which they pursue the goals of the partnership does not necessarily end that partnership. Although not as onerous as the common law veil piercing standard, the test is rigorous: when parties, including when operating as a partnership, "control[] a subsidiary company so that it may be used as a mere agency or instrumentality," a court may "deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." Wabash Ry., 7 F.2d at 344.

--------

[11] See also Jolin v. Oster, 172 N.W.2d 12, 16 n.1 (Wis. 1969) (collecting cases stating whether jurisdictions recognize joint ventures may survive incorporation, and noting the Eighth Circuit does).

III.

The MPPAA, ERISA, and tax law require courts to look beyond how the parties label, or structure, themselves. Courts must rather look to the substance of the relationships. See, e.g., Connors, 923 F.2d at 1467-68 (finding MPPAA withdrawal liability where individuals formed a partnership despite never explicitly agreeing to form one); Johnson, 991 F.2d at 391-94 (adopting the test in Connors).[12]  PBGC regulations direct us to Treasury regulations governing common control, which in turn require us to determine, under federal partnership law and the Luna test, whether the Funds formed a partnership-in-fact. There are some facts here under the Luna factors that tend to support a conclusion that the Sun Funds formed a partnership-in-fact to assert common control over SBI, but consideration of all of the factors leads to the opposite conclusion.

We first consider the Luna factors that favor a finding of de facto partnership. Even before incorporating SSB-LLC, the Sun Funds together "[sought] out potential portfolio companies . . . in need of extensive intervention with respect to their management and operations, to provide such intervention, and then to sell the companies." Sun Capital II, 724 F.3d at 142

_____

[12]    Indeed in Tower, the Supreme Court disregarded the parties' own identification as a partnership when the substance of their relationship did not evidence a partnership.  327 U.S. at 282, 291-92.

- 20 -

(emphasis added). The Funds, through SCAI, developed restructuring and operating plans for target companies before actually acquiring them through LLCs.[13] Id. This behavior is some evidence of the Sun Funds "exercis[ing] mutual control over and assum[ing] mutual responsibilities for the enterprise" of identifying, acquiring, and selling portfolio companies together. Luna, 42 T.C. at 1078. Moreover, if the Sun Funds had in fact formed a partnership through these pre-incorporation activities, the mere creation of SSB-LLC would not, as a matter of law, in and of itself end this already-existing partnership-in-fact. See Wabash Ry., 7 F.2d at 342-44.

The organization of the control of the Sun Funds and of control over SBI also is some evidence of a partnership-in-fact. The two men in control of the Funds' general partners, Leder and Krouse, essentially ran things for both the Funds and SBI.[14]

---

[13] This was a usual mode of operation; the Funds similarly coinvested and comanaged other companies between 2005 and 2008. They adopted the same organizational structure for these companies as they did with SBI.

[14] Sun Capital III, 172 F. Supp. 3d at 461-62. As the only members of the Sun Funds' general partners' limited partner committees, Leder and Krouse wholly controlled the general partners and, by extension, the Sun Funds. Sun Capital II, 724 F.3d at 134. Although the Sun Funds have different limited partners, these partners may not participate in management decisions, and so Leder and Krouse had sole management authority. See B. Cheffins & J. Armour, The Eclipse of Private Equity, 33 Del. J. Corp. L. 1, 9 (2008) (discussing the role of limited partners).

Together, and at Leder and Krouse's direction, the Sun Funds placed SCAI employees in two of SBI's three director positions, allowing SCAI to control SBI. Sun Capital III, 172 F. Supp. 3d at 467. Moreover, this pooling of resources and expertise in SCAI, which the Funds used not only to identify, acquire, and manage portfolio companies, and structure those deals, but to provide management consulting and employees to portfolio companies, including SBI, is evidence tending to show a partnership. See Cahill v. Comm'r, 106 T.C.M. (CCH) 324, 2013 WL 5272677, at *4 (2013) (concluding a party's desire "to pool his resources and to develop business jointly" evidenced a partnership); Luna, 42 T.C. at 1078 (holding that "mutual control over and . . . mutual responsibilities for [an] enterprise" indicate a partnership-in-fact). Indeed, the record does not show a single disagreement between the Sun Funds over how to operate SSB-LLC. The Funds' conduct in managing SSB-LLC is further evidence of a partnership-in-fact sitting above. Cf. Luna, 42 T.C. at 1077 (paralleling Luna factor one: "[t]he agreement of the parties and their conduct in executing its terms" (emphasis added)).

We next discuss the Luna factors that counsel against recognizing a partnership-in-fact. The record evidence is clear that the Funds did not "intend[] to join together in the present conduct of the enterprise" (at least beyond their coordination within SSB-LLC). Comm'r v. Culbertson, 337 U.S. 733, 742 (1949);

see also Luna, 42 T.C. at 1077 (counting against factor one). The fact that the Funds expressly disclaimed any sort of partnership between the Funds counts against a partnership finding as to several of the Luna factors. See Luna, 42 T.C. at 1077-78 (counting against factor one, the "agreement of the parties"; factor five, "whether business was conducted in the joint names of the parties"; and factor six, "whether the parties . . . represented to . . . persons with whom they dealt that they were joint venturers"). Most of the 230 entities or persons who were limited partners in Sun Fund IV were not limited partners in Sun Fund III. The Funds also filed separate tax returns, kept separate books, and maintained separate bank accounts -- facts which tend to rebut partnership formation.[15] Id. at 1078 (counting against factors six and seven). The Sun Funds did not operate in parallel, that is, invest in the same companies at a fixed or even variable ratio, which also shows some independence in activity and structure.

The creation of an LLC by the Sun Funds through which to acquire SBI also shows an intent not to form a partnership (although not as categorically as the Funds contend). The formation of an LLC both prevented the Funds from conducting their

_____

[15] There was some disagreement at oral argument about whether the record shows the Sun Funds co-investing with entities that Leder and Krouse do not control. The answer to this question would not change our decision.

business in their "joint names" (<u>Luna</u> factor five) and limited the manner in which they could "exercise[] mutual control over and assume[] mutual responsibilities for" managing SBI (<u>Luna</u> factor eight). <u>Id.</u>

The fact that the entities formally organized themselves as limited liability business organizations under state law at virtually all levels distinguishes this case from <u>Connors</u> and other cases in which courts have found parties to have formed partnerships-in-fact, been under common control, and held both parties responsible for withdrawal liability. <u>E.g.</u>, <u>Connors</u>, 923 F.2d at 1467–68. These cases often involved individuals (typically married couples), rather than limited liability business entities like limited partnerships, further distinguishing them from the instant case. <u>E.g.</u>, <u>id.</u> at 1464. And many of the cases in which courts have recognized these types of partnerships involved fractionalizing already-existing businesses, rather than pursuing investments in different ones. <u>E.g.</u>, <u>id.</u> at 1467–68; <u>Johnson</u>, 991 F.2d at 392–94. Using the <u>Luna</u> factors, we conclude that most of them, on these facts, point away from common control.

We credit the district court for its careful and reasoned analysis of the complex facts and law at hand. Nonetheless, the district court (and the Pension Fund and PBGC) too greatly discounted the <u>Luna</u> factors rebutting partnership-in-fact formation. Importantly, although the district court correctly

concluded that incorporating SSB-LLC did not in and of itself prevent recognizing a partnership-in-fact between the Funds, SSB-LLC's incorporation implicates many Luna factors counting against that recognition (an analysis absent from the district court's opinion).

Moreover, we are reluctant to impose withdrawal liability on these private investors because we lack a firm indication of congressional intent to do so and any further formal guidance from PBGC. Two of ERISA and the MPPAA's principal aims -- to ensure the viability of existing pension funds and to encourage the private sector to invest in, or assume control of, struggling companies with pension plans -- are in considerable tension here.

We do not reach other legal issues in the case, including the trade or business issue. We decide the issue of common control only as it has been framed before us and do not reach other arguments that might have been available to the parties.

IV.

We reverse entry of summary judgment for the Pension Fund and remand with directions to enter summary judgment for the Sun Funds. No costs are awarded.