# United States Court of Appeals
## For the First Circuit

No. 19-1908

PATRICIA C. COFFEY,

Plaintiff, Appellant,

v.

NEW HAMPSHIRE JUDICIAL RETIREMENT PLAN;
BOARD OF TRUSTEES OF THE NEW HAMPSHIRE JUDICIAL RETIREMENT PLAN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Stephen D. Rosenberg, Caroline M. Fiore, The Wagner Law Group, Russell F. Hilliard, and Upton & Hatfield LLP were on brief for appellant.
Scott H. Harris, Benjamin B. Folsom, and McLane Middleton, P.A. were on brief for appellee.

April 21, 2020

**LYNCH**, **Circuit Judge**. The issue on appeal is whether the New Hampshire Judicial Retirement Plan ("the Plan") allows a former judge who resigned with sufficient years of creditable service, but before reaching the minimum retirement age, to receive a Service Retirement Allowance ("SRA") upon later reaching the retirement age. In agreement with the district court, we hold that it does not. We affirm summary judgment for the Plan.

I.

A.   The Judicial Retirement Plan Statute

The General Court of New Hampshire ("legislature") enacted the Plan as "a defined benefit plan providing disability, death, and retirement protection to members and their families." N.H. Rev. Stat. Ann. § 100-C:2(I). The Plan defines a "member" as "any full-time supreme court, superior court, or circuit court judge." Id. § 100-C:1(IX). The Plan "is intended for all time to meet the requirements of a qualified pension trust within the meaning of section 401(a), and to qualify as a governmental plan within the meaning of section 414(d) of the United States Internal Revenue Code of 1986, as amended." Id. § 100-C:2(I).

The Plan states in the "Service Retirement Benefits" provision that

> [a]ny member who has at least 15 years of creditable service and is at least 60 years of age . . . may retire on a service retirement allowance or a reduced service retirement allowance, upon written application to the

- 2 -

board setting forth on what date, not less than 30 days nor more than 90 days subsequent to the filing of the application, the member desires to be retired. During such period of notification, the member may have separated from service.

N.H. Rev. Stat. Ann. § 100-C:5(I).[1] "Retirement" is defined as "withdrawal from active service with a retirement allowance granted under the provisions of this chapter." Id. § 100-C:1(XIV).

A member who retires with five years of creditable service but is not eligible for an SRA is entitled to the return of the member's accumulated contributions to the Plan and any interest accrued on those contributions. Id. § 100-C:5(VII).

The Plan also allows a member to retire if he or she becomes disabled. The "Disability Retirement Benefits" provision states that

[r]egardless of a member's length of service, any member who becomes permanently and totally disabled may apply to the board of trustees to retire on a disability retirement allowance . . . . Such application shall be granted provided that a physician . . . certifies that the member is mentally or physically incapacitated for further performance of duty, that such incapacity is likely to be permanent, and that such person should be retired. A member's disability retirement allowance shall be equal to 70 percent of the member's final year's salary.

_____

[1]    The Plan provides that the SRA will vary with the age at which the member retires and the member's years of creditable service at retirement. N.H. Rev. Stat. Ann. § 100-C:5(II-IV). The Plan also accords death benefits to the surviving spouse or minor children of a member who "dies in office." Id. § 100-C:7(I).

- 3 -

Id. § 100-C:6.  Further, the Plan provides that,

> [i]f a member ceases to be a judge for reasons other than retirement or death, the amount of such member's accumulated contributions shall be paid to such member within 3 months after such member's written request therefor, provided that the member may not file a written request for such payment until at least 30 days from the date the member ceases to be a judge.

Id. § 100-C:8(I).

B.   Facts

On October 25, 1991, Coffey became a Superior Court justice for the state of New Hampshire.  She served full-time as a justice until she resigned on April 21, 2008;  that is, for sixteen-and-a-half years.  She was fifty-four years old when she resigned.

On January 16, 2015, at the age of sixty-one, Coffey applied for an SRA.

On February 24, 2015, the Board of Trustees of the New Hampshire Judicial Retirement Plan ("Board") denied her application.  It stated that it interpreted N.H. Rev. Stat. Ann. § 100-C:5(I) "as requiring a member be employed up to the point of retirement"; that is, to be in active service at the time he or she applies for an SRA.  Coffey's attorney protested, arguing that both the plain language of the statute and compliance with the governmental plan provisions of the Internal Revenue Code ("Code") supported Coffey's interpretation and SRA application.  On June

- 4 -

12, 2015, after considering these arguments, the Board issued a final decision denying Coffey's application for an SRA and so notified her.

## C.   Procedural History

Almost three years later, Coffey filed a lawsuit in the United States District Court for the District of New Hampshire against the Plan and the Board.  She sought a declaratory judgment that she was eligible for an SRA and brought claims for violations of Chapter 100-C, section 5 of the New Hampshire Revised Statutes and of section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA").  She also brought a similar claim for breach of contract under New Hampshire state law.

On November 26, 2018, the district court dismissed Coffey's ERISA claim for failure to state a claim.[2]  On August 14, 2019, the district court granted summary judgment in favor of the Plan as to the remaining claims.  Coffey v. N.H. Judicial Ret. Plan, No. 18-cv-503, 2019 WL 3816731, at *6 (D.N.H. Aug. 14, 2019). The court concluded that the plain language of the statute "requires a judge to be in active service when she elects to retire and claim a service retirement allowance" and that "textual evidence" from the entire statutory scheme supported that conclusion.  Id. at *3-4.  This appeal followed.

_____

[2]   The dismissal of the ERISA claim was not appealed.

II.

A.    Standard of Review

"We review a grant or denial of summary judgment, as well as pure issues of law, de novo."  Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund, 943 F.3d 49, 55 (1st Cir. 2019) (quoting Sun Capital Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund, 724 F.3d 129, 138 (1st Cir. 2013)).

B.    Statutory Interpretation Under New Hampshire Law

The parties agree there are no disputes of material fact and the issue is one of law.  The issue is one of statutory interpretation:  that is, whether Coffey is eligible to receive an SRA on her application.

To interpret a statute, New Hampshire courts[3] "first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning."  In re Carrier, 82 A.3d 917, 920 (N.H. 2013).  "[I]f the language is clear and unambiguous," the court need "not look beyond the language of the statute."  In re Town of Seabrook, 44 A.3d 518, 525 (N.H. 2012).  New Hampshire courts "interpret legislative intent from

_____

[3]    To interpret a New Hampshire state statute, we employ New Hampshire interpretive methods and canons of construction. See Garran v. SMS Fin. V, LLC (In re Garran), 338 F.3d 1, 6 (1st Cir. 2003) (stating that when a state court has not interpreted a state statute, the federal court "must predict how the [highest state court] would interpret the statute").

the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include."  Carrier, 82 A.3d at 920.

"[W]henever possible, every word of a statute should be given effect."  Garand v. Town of Exeter, 977 A.2d 540, 544 (N.H. 2009) (quoting Town of Amherst v. Gilroy, 950 A.2d 193, 197 (N.H. 2008)).  Importantly, "[w]hile the title of a statute is not conclusive of its interpretation, it provides significant indication of the legislature's intent in enacting the statute." Id. at 545 (quoting State v. Gubitosi, 958 A.2d 962, 966 (N.H. 2008)).

New Hampshire courts "construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result.  Moreover, [they] do not consider words and phrases in isolation, but rather within the context of the statute as a whole."  Carrier, 82 A.3d at 920 (citation omitted).  Following this approach, we must also "presume that the legislature does not enact unnecessary and duplicative provisions."  Garand, 977 A.2d at 544 (quoting State v. Gifford, 808 A.2d 1, 3 (N.H. 2002)).

C.    Section 100-C:5 Requires a Member To Be in Active Service
      When He or She Applies for an SRA

The district court correctly concluded that "the only plausible way to read [section] 100-C:5, I is that it requires a judge to be in active service when she elects to retire and claim

- 7 -

a service retirement allowance."  Inserting the definition in section 100-C:1(XIV) of "retirement" into section 100-C:5(I) reads as:

> Any member who has at least 15 years of creditable service and is at least 60 years of age . . . may ["withdraw[] from active service with a retirement allowance granted under the provisions of this chapter"] on a service retirement allowance or a reduced service retirement allowance, upon written application to the board setting forth on what date, not less than 30 days nor more than 90 days subsequent to the filing of the application, the member desires to be retired. During such period of notification, the member may have separated from service.

N.H. Rev. Stat. Ann. §§ 100-C:1(XIV), 100-C:5(I).  Read with the definition of "retirement," the plain language of this section requires a retirement-age member with sufficient creditable service to "withdraw from active service" to receive an SRA.

Although this substitution does show a minor superfluity in the provision, this does not alter our interpretation.  First, it does not create the significant redundancy and either inconsistency or absurd result that Coffey's interpretation would. See infra; see also Garand, 977 A.2d at 544 ("[W]henever possible, every word of a statute should be given effect."  (emphasis added) (quoting Town of Amherst, 950 A.2d at 197)).  Although the district court adopted this interpretation and the Plan argues for it in its appellate brief, Coffey does not argue that this minor superfluity requires that we adopt her interpretation.  Any such

argument is waived.  Pignons S.A. de Mecanique v. Polaroid Corp.,
701 F.2d 1, 3 (1st Cir. 1983).

Second, if instead we use the dictionary definition of
"retire," the outcome would remain the same.  See In re Malisos,
103 A.3d 793, 795 (N.H. 2014) (looking to dictionaries to determine
the "plain and ordinary meaning of [an undefined] term" in a
statute).  The Oxford English Dictionary defines "retire" as "[t]o
leave office, employment, or service permanently, now esp. on
reaching pensionable age; to stop working."  Retire, Oxford English
Dictionary (3d ed. 2010), www.oed.com/view/Entry/164325; see also
Retire,  Merriam-Webster  Online  Dictionary,  www.merriam-
webster.com/dictionary/retire  (last  visited  Apr.  20,  2020)
(defining  "retire"  as  "to  withdraw  from  one's  position  or
occupation  [or  to]  conclude  one's  working  or  professional
career").  This definition also requires that Coffey be leaving
active service when retiring.[4]

Coffey argues that the district court "overreached" by
interpreting the word "retire" in this section using the statutory
definition of "retirement."  We disagree.  The title of this
provision, "Service Retirement Benefits," shows the New Hampshire
legislature intended consistency between section 100-C:1, XIV's

---

[4]    We assume without deciding that Coffey is a "member" as
defined in section 100-C:1(IX).

definition of "retirement" and section 100-C:5(I)'s use of "retire." Garand, 977 A.2d at 545.

Coffey argues that the title does not support reading "retirement" into section 100-C:5(I). She contends that if the court reads the definition of "retirement" into the body of section 100-C:5(I), then the court also must read the definitions of "service" and "retirement" into the title. She argues that this would result in an absurd title, and so the statutory definition of retirement cannot be read into the title or body of the section.[5] This argument lacks merit.

Coffey does not cite any New Hampshire rule requiring a court to insert definitions into a statute's title and determine if it is coherent. New Hampshire law provides that a "title . . . provides significant indication of the legislature's intent," which here is that the legislature intended "retirement" and "retire" be construed consistently. Garand, 977 A.2d at 545.

Further, to adopt a definition of "retire" inconsistent with that of section 101-C:1(XIV) would make superfluous section 100-C:5's statement that "[d]uring [the thirty- to ninety-day] period of notification, the member may have separated from service." N.H. Rev. Stat. Ann. § 100-C:5(I). As the district

_____

[5]    The title would read:  "Service as a supreme court, superior court, full-time district court, or full-time probate court justice withdrawal from active service with a retirement allowance granted under the provisions of this chapter benefits."

court correctly stated, under "Coffey's reading . . . a judge could separate from service at any point before reaching retirement age and still claim a service retirement allowance." Coffey, 2019 WL 3816731, at *3. The explicit authorization to separate from service during this statutory notification period would have no meaning if, as Coffey argues, a judge could separate years before applying for an SRA. This would violate New Hampshire courts' strong aversion to superfluous statutory provisions. See, e.g., Garand, 977 A.2d at 544; Merrill v. Great Bay Disposal Serv., Inc., 484 A.2d 1101, 1103 (N.H. 1984) ("It is an elementary principle of statutory construction that all of the words of a statute must be given effect and that the legislature is presumed not to have used superfluous or redundant words.").

Coffey argues the district court's interpretation reads the word "may" as a "mandatory requirement," instead of correctly as a "permissive option." The district court's interpretation, she asserts, improperly "rewrite[s]" the statute and so must be reversed. Not so.

Our interpretation is not undercut by the permissive reading of "may." Under the first sentence of section 100-C:5(I), a member could "withdraw[] from active service with a retirement allowance." N.H. Rev. Stat. Ann. §§ 100-C:1(XIV), 100-C:5(I). The inclusion of the "During . . . service." sentence permits a

member to withdraw from service before (albeit only just before) the member technically retires.

The district court correctly concluded the statutory context also supported this interpretation.[6] Interpreting section 100-C:5 in light of section 100-C:6 reinforces that the New Hampshire legislature did not intend Coffey's interpretation.

If, as Coffey argues, a member need not be in active service to "retire," then interpreting "retire" consistently between sections 100-C:5 and 100-C:6 may yield absurd results. The district court offered the hypothetical considering

> a judge who resigned after serving for one day, went into private practice, and ten years later became unable to perform judicial duties but was otherwise capable of practicing law. Under Coffey's reading, that former judge would be entitled to a disability retirement allowance because she did not have to be in active service when she became disabled.

Coffey, 2019 WL 3816731, at *3. Coffey's interpretation either requires that the disability provision allow for such absurd results, or that the Plan use the term "retire" inconsistently.[7]

---

[6] The district court also concluded that interpreting section 100-C:5 in light of section 100-C:8 and in comparison to the New Hampshire public employee retirement plan further supported its interpretation. We need not address these conclusions or the parties' related arguments, as they are unnecessary to deciding this case.

[7] Coffey argues for the latter: that because the Retirement and Disability provisions are separate sections and the statute does not expressly state that they "interact," that it is reversible error to rely on one in interpreting the other. This

- 12 -

New Hampshire law prohibits either result.  See Carrier, 82 A.3d at 920.

D.    Coffey's Interpretation Is Not Necessary for the Plan To Comply with Section 401 of the Code

Coffey further argues that the Code, and the Plan's express intent to satisfy the Code's requirements, supports her interpretation.  Section 100-C:2(I) states that the Plan "is intended for all time to meet the requirements of a qualified pension trust within the meaning of section 401(a), and to qualify as a governmental plan within the meaning of section 414(d) of the United States Internal Revenue Code of 1986, as amended."  N.H. Rev. Stat. Ann. § 100-C:2(I).  But our interpretation does not violate the Code's requirements.  In consequence, Coffey's argument is without merit.

For a governmental plan to "constitute a qualified trust under [§ 401]," it must "satisf[y] the requirements of [§] 411." 26 U.S.C. § 401(a)(7).  Section 411 requires a governmental plan to "meet[] the vesting requirements resulting from the application of [§§] 401(a)(4) and 401(a)(7) as in effect on September 1, 1974." Id. § 411(e)(2).

Section 401(a)(4) requires that the Plan "not discriminate in favor of employees who are officers, shareholders,

_____

atomistic approach directly contradicts New Hampshire law and so lacks merit.  See Carrier, 82 A.3d at 920.

persons whose principal duties consist in supervising the work of other employees, or highly compensated employees." Id. § 401(a)(4) (1970).

Section 401(a)(7) requires the Plan to "provide[] that, upon its termination or upon complete discontinuance of contributions under the [P]lan, the rights of all employees to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable."[8] Id. § 401(a)(7) (1970). The plain language of this provision does not require any specific vesting schedule as to individual employees. Further, IRS Revenue Ruling 68-302 supports this interpretation, stating that "[v]esting prior to normal or stated retirement age, other than upon termination of the plan or complete discontinuance of contributions thereunder, is not a requisite for qualification,

---

[8] As of September 1, 1974, Internal Revenue Service ("IRS") regulations stated that "termination" is fact-specific, but tends to cabin the term situations like where the employer ceases to exist or excludes through plan amendment or discharge groups of employees. 26 C.F.R. § 1.1401-6(b)(1)-(2). The regulations define a "complete discontinuance of contributions" with respect to employer contributions to the plan only. Id. § 1.1401-6(c)(1)-(2). "Voluntary employee decisions to leave the employer or terminations not connected with the significant corporate event do not constitute 'employee terminations' which would trigger partial termination." Sage v. Automation ,Inc. Pension Plan & Tr., 845 F.2d 885, 891 (10th Cir. 1988) (quoting Weil v. Ret. Plan Admin. Comm. for the Terson Co., 750 F.2d 10, 13 (2d Cir. 1984)).

- 14 -

under section 401(a) of the Internal Revenue Code."[9]  Rev. Rul. 68-302, 1968-1 C.B. 163.

In requiring members to be in active service when applying for an SRA, the Plan does not violate either section of the Code.  As to § 401(a)(4), because all members are judges, the Plan does not discriminate.  Because the Plan has neither "terminat[ed]" nor "discontinu[ed] . . . contributions," it also complies with the plain language of § 401(a)(7).  26 U.S.C. § 401(a)(7) (1970); see also Debell v. Bd. of Trs., Pub. Emps.' Ret. Sys. (PERS), 815 A.2d 997, 1001 (N.J. Super. Ct. App. Div. 2003) ("[Pre-ERISA § 401(a)(7)] assures that all employees with accrued benefits would be vested according to the schedule contained in the statute if the plan were terminated, not . . . when an employee-member of the plan is terminated.").

Coffey's sole argument against this interpretation is that an IRS memorandum interprets the pre-ERISA Code as requiring in this case a "15-year-cliff vesting schedule," i.e., Coffey's

---

[9]     IRS guidance also supports this interpretation.  IRS Publication 772 states that "[v]arious provisions are in use, ranging from complete and immediate vesting through different forms of graduated vesting (upon completion of stated service or participation requirements and/or reaching a specified age) to no vesting until attainment of normal or stated retirement age." I.R.S. Publication 778, Part 5(c) (1972).

favored interpretation of section 100-C:6(I).[10]  See Memorandum from Mark O'Donnell, Acting Director EP Rulings & Agreements, IRS, on Processing of Governmental Plans Determination Letter Applications with respect to Vesting Issues (Apr. 30, 2012) ("O'Donnell Memorandum").  But her reliance on this memorandum is misplaced.

The vesting requirements in the O'Donnell Memorandum are "safe harbor[s]," not requirements.  Id. at 3.  As the district court correctly concluded, the Plan can be qualified under the Code without necessarily satisfying a safe harbor requirement. The O'Donnell Memorandum states that a plan not within a safe harbor "may not be issued a favorable determination letter" and "should be referred . . . for further analysis and resolution." Id. at 4 (emphasis added).  The permissive "may" and "further analysis" statement mean that such a plan is not necessarily entitled to a favorable determination.  See, e.g., United States v. Mass. Water Res. Auth., 256 F.3d 36, 51 (1st Cir. 2001) (discussing the "permissive 'may'"); In re Liquidation of the Home Ins. Co., 953 A.2d 443, 452 (N.H. 2008) ("It is the general rule that in statutes the word 'may' is permissive only . . . ." (quoting In re Rowan, 694 A.2d 1002, 1004 (N.H. 1997))).  The

---

[10]  We need not address what degree of deference, if any, we must accord to this memorandum, as our holding does not conflict with it.

memorandum does not, as Coffey contends, require the Plan to adopt one of the safe harbor vesting schedules to receive a favorable determination.[11]

III.

Affirmed.

---

[11]    Nor does the IRS website, which, despite Coffey's mischaracterizations, merely repeats the "safe harbor" language of the O'Donnell Memorandum.